USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/26/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X

IN RE: INITIAL PUBLIC OFFERING
SECURITIES LITIGATION

This document relates to: IN RE CORVIS
CORP. INITIAL PUBLIC OFFERING
SECURITIES LITIGATION; IN RE
ENGAGE TECHNOLOGIES, INC.
INITIAL PUBLIC OFFERING
SECURITIES LITIGATION; IN RE
FIREPOND, INC. INITIAL PUBLIC
OFFERING SECURITIES LITIGATION;
IN RE IXL ENTERPRISES, INC.
INITIAL PUBLIC OFFERING
SECURITIES LITIGATION; IN RE
SYCAMORE NETWORKS, INC.
INITIAL PUBLIC OFFERING
SECURITIES LITIGATION; IN RE VA
LINUX SOFTWARE CORP., formerly
known as VA LINUX SYSTEMS, INC.
INITIAL PUBLIC OFFERING
SECURITIES LITIGATION.

-------------------------------------------------- X

**OPINION AND ORDER**

**MASTER FILE NO. 21 MC 92
(SAS)**

01 Civ. 3857 (SAS)
01 Civ. 8404 (SAS)
01 Civ. 7048 (SAS)
01 Civ. 9417 (SAS)
01 Civ. 6001 (SAS)
01 Civ. 0242 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

This Opinion addresses the six focus cases of the *In re Initial Public
Offering Securities Litigation* proceedings.  On December 5, 2006, the Court of
Appeals for the Second Circuit reversed this Court's grant of class certification in
those six cases.  In response, plaintiffs amended the Master Allegations and

1

Complaints. Defendants now move to dismiss the Amended Complaints. For the

reasons stated herein, defendants' motion is granted in part and denied in part.

## II. BACKGROUND

### A. Overview

The allegations in these cases are comprehensively described in my

Opinion dated February 19, 2003 (the "February 19 Opinion").[1] Familiarity with

that Opinion is assumed, and only a brief overview is provided here. Essentially,

plaintiffs allege that defendants fraudulently inflated the share prices of three

hundred and nine technology stocks[2] during and after their initial public offerings

("IPOs") through an elaborate scheme characterized by tie-in agreements,

undisclosed compensation, and analyst conflicts. According to plaintiffs, certain

investment banks (the "Underwriter Defendants") required some substantial

investors that sought allocations in the IPOs to participate in the scheme. The

companies that conducted the offerings (the "Issuer Defendants") and their

---

[1]     *See In re Initial Public Offering Sec. Litig.* (*"IPO I"*), 241 F. Supp. 2d 281, 293-95 (S.D.N.Y. 2003).

[2]     As originally filed, the IPOs of three hundred and ten companies were at issue. The action that related to one of the companies has been dismissed. *See Liu v. Credit Suisse First Boston Corp.*, 383 F. Supp. 2d 566 (S.D.N.Y. 2005), *aff'd sub nom.*, *Tenney v. Credit Suisse First Boston Corp.*, No. 05 Civ. 3430, 2006 WL 1423785 (2d Cir. May 19, 2006), *cert. denied*, — U.S. —, 127 S. Ct. 733 (2006).

2

directors and officers allegedly profited from the scheme – despite low offering prices as compared to the stocks' immediate prices in the aftermarket – by taking advantage of the artificially inflated stock to raise capital, enter into stock-based transactions, or sell their individual holdings at high prices. Plaintiffs allege that the value of their holdings plummeted when this artificial inflation dissipated.

Plaintiffs have filed an Amended Complaint in each of the six focus cases. The Amended Complaints detail the allegations about each Issuer Defendant's offering and set forth the various claims against the Underwriter Defendants and the Issuer Defendant. In addition, plaintiffs have filed a document entitled "Amended Master Allegations" that contains the allegations that are shared by all of the Amended Complaints. The individual Amended Complaints incorporate the Amended Master Allegations by reference.

## B. The Allegations

### 1. Tie-in Allegations and Undisclosed Compensation

Plaintiffs essentially accuse the Underwriter Defendants of taking steps to guarantee "large gains in aftermarket trading on shares following initial public offerings by improperly creating artificial aftermarket demand."[3] This was accomplished by "conditioning certain share allocations in initial public offerings

---

[3]     Amended Master Allegations ("AMA") ¶ 14.

3

to certain customers upon the requirement that those customers agree to purchase,

in the aftermarket, additional shares of stocks in which they received allocations,

and, in some instances, to make those additional purchases at pre-arranged,

escalating prices ('Tie-in Agreements').["4"] The Underwriter Defendants also

allegedly tracked their customers' profits from IPO allocations and required that

certain of those customers return a portion of the profits through various

transactions ("Undisclosed Compensation").[5]

> For example, certain customers who received allocations of
> IPO shares in the following listed IPOs fulfilled their
> commitments to purchase shares in the aftermarket
> pursuant to Tie-in Agreements, netting the Underwriter
> Defendants and other underwriters of the referenced
> offerings substantial additional trading revenue and
> commissions and substantially and artificially increasing
> the demand for the issuer's shares . . . .[6]

The statement made in the Amended Master Allegations with respect to the IPO of

Corvis Corp. is representative of the allegations: "One customer, in order to

obtain shares of the Corvis IPO from CSFB, was required or induced to and did

purchase from CSFB in the aftermarket, at prices substantially above the IPO

---

[4]   *Id.*

[5]   *See id.* ¶ 17.

[6]   *Id.* ¶ 37.

4

price, thousands of additional Corvis shares."[7]

### 2. Analyst Allegations

Plaintiffs also contend that the Underwriter Defendants used their analysts "to artificially inflate and maintain the aftermarket price of [the IPO] securities."[8] "[T]he Underwriter Defendants utilized their analysts to recommend such stocks at their first opportunity, typically at the end of the so-called 'quiet period,' 25 days following the offering."[9] "Between 1998 and 2000, 97% of analyst initiations at the expiration of the quiet period were by managing underwriters of the initial public offering. Virtually all such coverage was positive."[10] "In many instances the favorable recommendations were accompanied by unrealistic price targets, frequently reiterated throughout the relevant class periods."[11]

### 3. Motivations of the Underwriters and Issuers

In the Amended Master Allegations, plaintiffs allege general

---

[7]    *Id.*

[8]    *Id.* ¶ 85.

[9]    *Id.*

[10]    *Id.* ¶ 108.

[11]    *Id.* ¶ 85.

motivations that the various defendants had in carrying out these Tie-in Arrangements. In addition to receiving various forms of Undisclosed Compensation, "the Underwriter Defendants were able to parlay the spectacular increase in market capitalization attendant to each offering into additional and highly lucrative investment banking opportunities for themselves."[12] "Examples of these additional opportunities include the underwriting of add-on offerings . . . , the underwriting and sales of debt and convertible offerings and advisory services including financial consulting and advising on mergers and acquisitions."[13] Likewise, during the late 1990s, "the Underwriter Defendants marketed themselves by emphasizing the prospect of substantial market gains, including the first day gains, of IPO Offerings to entice potential customers to retain those underwriters."[14]

### C.    Claims

Based on these allegations, plaintiffs have brought four claims pursuant to the Securities Act and the Exchange Act against each issuer and the

---

[12]    *Id.* ¶ 109.

[13]    *Id.*

[14]    *Id.* ¶ 110.

underwriters involved in each issuer's IPO.[15] The claims brought in the action against Corvis are representative of the focus cases: *First*, plaintiffs allege that Corvis and each member of the underwriting syndicate violated Section 11 of the Securities Act by including untrue statements and omitting statements of material fact in Corvis's registration statement.[16] *Second*, they allege that the Underwriter Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by manipulating the market for Corvis securities by inflating the price for Corvis securities and inducing plaintiffs to purchase Corvis securities at those inflated prices.[17] *Third*, plaintiffs allege that the Underwriter Defendants violated Section 10(b) and Rule 10b-5 by making material misrepresentations and omissions for the purpose of securing and concealing the Tie-in Agreements, Undisclosed

---

[15]    In the two cases where the issuer conducted secondary offerings, plaintiffs have also alleged violations of Section 11 of the Securities Act and Section 10(b) of the Exchange Act in connection with those secondary offerings. *See* Sycamore Second Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws ("Sycamore Compl.") ¶¶ 78-86; iXL Second Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws ("iXL Compl.") ¶¶ 74-82. I do not address these additional claims separately because they are based on the same conduct and pled in the same manner as the primary offering claims.

[16]    *See* Corvis Second Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws ("Corvis Compl.") ¶¶ 59-67.

[17]    *See id.* ¶¶ 75-83.

7

Compensation, the conflicts of interest between the Underwriter Defendants and the improper utilization of analysts to inflate the price of Corvis securities or some combination thereof. *Fourth*, plaintiffs allege that Corvis violated Section 10(b) and Rule 10b-5 by carrying out a scheme to artificially inflate the price of the company's stock by making material misrepresentations and omissions to conceal the Underwriters' behavior.[18]

## D. Procedural Posture

On October 13, 2004, this Court issued an Opinion and Order certifying classes in the six focus cases.[19] The parties previously had selected the focus cases and agreed that "[t]he rulings on the class certification motions in the selected cases will govern those cases only."[20] Nevertheless, the Court stated that its Opinion with respect to the six focus cases was "intended to provide strong guidance, if not dispositive effect, to all parties when considering class certification in the remaining actions."[21]

The Underwriter Defendants appealed the grant of class certification

---

[18]    *See id.* ¶¶ 102-111.

[19]    *See In re Initial Public Offering Sec. Litig. ("IPO II")*, 227 F.R.D. 65 (S.D.N.Y. 2004).

[20]    *Id.* at 72-73 & n.7.

[21]    *Id.* at 73.

8

to the Second Circuit. On December 5, 2006, the Second Circuit vacated the class

certifications and remanded the cases for further proceedings ("*Miles I*").[22] On

April 6, 2007, the *Miles* panel denied a petition for rehearing but issued a written

opinion clarifying its ruling ("*Miles II*").[23] Plaintiffs have amended the Master

Allegations and the Complaints in the six focus cases, and defendants now move

to dismiss.[24]

In the February 19 Opinion, I addressed several of the issues now

raised by defendants in their motions to dismiss. The law of the case doctrine

generally forecloses relitigation of issues expressly or impliedly decided earlier in

the proceeding.[25] While "application of the doctrine remains a matter of

---

[22]      *See Miles v. Merrill Lynch & Co.* ("*Miles*"), 471 F.3d 24, 24 (2d Cir.
2006).

[23]      *See Miles v. Merrill Lynch & Co.* ("*Miles II*"), 483 F.3d 70 (2d Cir.
2007).

[24]      The issuer in one of the focus cases, *In re Engage Tech., Inc. Initial
Public Offering Sec. Litig.*, No. 01 Civ. 8404 (S.D.N.Y. filed Sept. 7, 2001), is
currently in bankruptcy proceedings and plaintiffs are enjoined from proceeding
against it. *See Order Confirming Debtors' Second Amended Plan of Liquidation
Under Chapter 11 of the Bankruptcy Code, Dated March 30, 2004* ¶ 18, Ex. 7 to
Declaration of Joel C. Haims, Esq., Attorney for the Issuer Defendants, in Support
of the Issuer Defendants' Motion to Dismiss Plaintiffs' Second Amended
Complaint. The Issuer Defendants have not moved to dismiss the Engage action,
but the Underwriter Defendants have. *See* 11/13/07 Notice of Motion; 11/14/07
Notice of Motion.

[25]      *See United States v. Becker*, 502 F.3d 122, 127 (2d Cir. 2007).

9

discretion, not jurisdiction," I decline to revisit my earlier rulings in this case except where there has been an intervening change in the controlling law.[26] Of course, by the operation of the mandate rule, I am also bound by the decisions of the Second Circuit in *Miles I*.[27]

## III. APPLICABLE LAW

### A. Motion to Dismiss

When deciding a defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must "accept as true all of the factual allegations contained in the complaint"[28] and "draw all inferences in the light most favorable to the non-moving party . . . ."[29] Nevertheless, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a

---

[26]     *Id.*

[27]     *See Burrell v. United States*, 467 F.3d 160, 165 (2d Cir. 2006) ("The mandate rule is a branch of the law-of-the-case doctrine. This rule holds 'that where issues have been explicitly or implicitly decided on appeal, the district court is obliged, on remand, to follow the decision of the appellate court.'") (quoting *United States v. Minicone*, 994 F.2d 86, 89 (2d Cir. 1993)). I note that this rule "is a firm one and rigidly binds the district court." *Id.* (citing *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)).

[28]     *Bell Atl. Corp. v. Twombly*, — U.S. —, 127 S. Ct. 1955, 1975 (2007) (quotation omitted). *Accord In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

[29]     *In re NYSE Specialists*, 503 F.3d at 95.

presumption of truthfulness."[30]

In deciding a motion to dismiss, the court is not limited to the face of the complaint, but "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[31] However, "before materials outside the record may become the basis for a dismissal . . . it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document."[32]

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[33] To survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility."[34] Although the complaint need not provide

---

[30]   *Id.* (quotation omitted).

[31]   *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[32]   *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

[33]   *Erickson v. Pardus*, — U.S. —, 127 S. Ct. 2197, 2200 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

[34]   *See Bell Atl.*, 127 S. Ct. at 1970.

11

"detailed factual allegations,"[35] it must "amplify a claim with some factual allegations . . . to render the claim *plausible*."[36] The standard is no longer that a complaint can be dismissed only if there us "no set of facts" that plaintiff could prove "which would entitle him to relief."[37] Rather, the complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"[38]

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss."[39] Those heightened pleading requirements are imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA").[40]

---

[35]    *Id.* at 1964. *Accord ATSI*, 493 F.3d at 98 n.2 (applying the standard of plausibility outside *Bell Atlantic*'s anti-trust context).

[36]    *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original).

[37]    *Bell Atl.*, 127 S. Ct. at 1969 (quoting *Conley v. Gibson*, 355 U.S. 45-46 (1957)). *Accord id.* ("The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard").

[38]    *ATSI*, 493 F.3d at 98 (quoting *Bell Atl.*, 127 S. Ct. at 1965).

[39]    *Id.* at 99.

[40]    15 U.S.C. § 78u-4(b).

### 1. Rule 9(b)

A complaint alleging securities fraud must satisfy Rule 9(b), which requires the complaint to "state with particularity the circumstances constituting fraud or mistake."[41] "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits."[42] To comply with the requirements of Rule 9(b), a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[43] "Allegations that are conclusory or unsupported by factual assertions are insufficient."[44]

Where a complaint alleges a false statement, the complaint must "state with particularity the specific facts in support of [plaintiffs'] belief that

---

[41]    Fed. R. Civ. P. 9(b). *See also ATSI*, 493 F.3d at 99.

[42]    *ATSI*, 493 F.3d at 99 (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)).

[43]    *Rombach*, 355 F.3d at 170 (quotation omitted). *Accord ATSI*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

[44]    *ATSI*, 493 F.3d at 99.

[defendants'] statements were false when made."[45] In situations "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."[46]

## 2. PSLRA

"[P]rivate securities fraud actions must also meet the PSLRA's pleading requirements or face dismissal."[47] The PSLRA requires plaintiffs to state with particularity "both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud."[48] "If the plaintiff alleges a false statement or omission, the PSLRA . . . requires that 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'"[49]

---

[45]     *Rombach*, 355 F.3d at 172 (quotation omitted).

[46]     *Novak*, 216 F.3d at 309 (citation omitted).

[47]     *ATSI*, 493 F.3d at 99 (citing 15 U.S.C. § 78u-4(b)(3)(A)).

[48]     *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, — U.S. —, 127 S. Ct. 2499, 2504 (2007) (quotation omitted) (citing 15 U.S.C. § 78u-4(b)(1), (2)).

[49]     *ATSI*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(1)).

### 3.   Scienter

Scienter, in relation to securities fraud, is "the intent to deceive, manipulate, or defraud."[50]  Scienter can be pled by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."[51]  "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."[52]  Under this theory of scienter, a plaintiff must show that the defendant's conduct is "'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"[53]  Thus, an express allegation of deliberate

---

[50]    *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 (1976).

[51]    *ATSI*, 493 F.3d at 99 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000)).

[52]    *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quotation omitted).

[53]    *Id.* (quoting *Honeyman v. Hoyt (In re Carter-Wallace, Inc. Sec. Litig.)*, 220 F.3d 36, 39 (2d Cir. 2000)).

misconduct can be sufficient to plead scienter.[54]

"Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."[55] Moreover, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."[56]

The PSLRA specifies that the plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[57] The Supreme Court recently clarified this requirement in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* There, the Court held that to determine whether scienter is adequately pled, courts must look at the complaint as a whole and "must take into account plausible opposing inferences."[58] "[A]n inference of

---

[54]     *See Suez Equity Investors v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001).

[55]     *Kalnit*, 264 F.3d at 139 (quotations omitted).

[56]     *Id.* (describing "[i]nsufficient motives" as including "(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation").

[57]     *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)).

[58]     *Tellabs*, 127 S. Ct. at 2509. These plausible opposing inferences, however, may be based only on the complaint and other public documents on which courts ordinarily rely in deciding a motion to dismiss, "while constantly

scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."[59] The inference need not, however, be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences."[60] The inquiry on a motion to dismiss is as follows: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"[61]

### B.    Section 10(b) and Rule 10b-5

To state a claim under rule 10b-5 for misrepresentations, the "plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."[62] With respect to the first element, the complaint

---

assuming the plaintiff's allegations to be true." *Id.* at 2509, 2511-12.

[59]    *Id.* at 2504-05.

[60]    *Id.* at 2510 (quotation omitted).

[61]    *Id.* at 2511. *Accord id.* at 2510 ("A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

[62]    *ATSI*, 493 F.3d at 105 (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)).

must "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made."[63]

"Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them."[64] In situations "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."[65] Mere "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."[66]

## 1. Causation

To state a claim for securities fraud, a plaintiff must plead "both

---

[63]  *Rombach*, 355 F.3d at 172 (quotation omitted).

[64]  *Novak*, 216 F.3d at 308 (citation omitted).

[65]  *Id.* at 309 (citation omitted).

[66]  *Id.* (citation omitted). *Accord Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) ("The fact that management's optimism about a prosperous future turned out to be unwarranted is not circumstantial evidence of conscious fraudulent behavior or recklessness: People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their steward ship and the prospects of the business that they manage." (quotation marks omitted)).

18

transaction causation (also known as reliance) and loss causation."[67] Transaction causation requires a plaintiff to demonstrate that "'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'"[68] Loss causation is "the proximate causal link between the alleged misconduct and the plaintiff's economic harm."[69] "To that end, the plaintiff's complaint must plead that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement."[70]

### a. Transaction Causation (Reliance)

The efficient capital market hypothesis "tells us that our existing markets for securities produce prices that (1) rapidly, if not instantaneously, reflect all available information; and (2) absorb this information in a rational way in producing trading prices."[71] In other words, the price of a security in a functioning market accurately reflects its value, given the information available to the public.

[67]     *ATSI*, 493 F.3d at 106.

[68]     *Id.* (quoting *Lentell*, 396 F.3d at 172).

[69]     *Id.* at 106-07 (citing *Dura Pharm. v. Broudo*, 544 U.S. 336, 346 (2005); *Lentell*, 396 F.3d at 172). *Accord Emergent Capital Inv. Mgmt. v. Stonepath Group, LLC*, 343 F.3d 189, 197 (2d Cir. 2003).

[70]     *ATSI*, 493 F.3d at 107 (citing *Lentell*, 396 F.3d at 173).

[71]     William T. Allen, *Securities Markets as Social Products: The Pretty Efficient Capital Market Hypothesis*, 28 J. Corp. L. 551, 553 (2003).

Therefore, in an efficient market, "[b]ecause most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action."[72]

## b.    Loss Causation[73]

"The concept of loss causation elucidated" by the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo* is "closely related to the common law doctrine of proximate cause."[74]  "*Dura* culls from the common law the black letter law that a fraud plaintiff must show that he acted on the basis of the fraud and suffered pecuniary loss as a result of so acting."[75]  A defendant's alleged "misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the

---

[72]    *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988).

[73]    I have discussed the Second Circuit's loss causation precedents in detail in an earlier Opinion in this case. *See In re Initial Public Offering Sec. Litig.*, 399 F. Supp. 2d 298 (S.D.N.Y. 2005).

[74]    *Merrill Lynch & Co. v. Allegheny Energy*, 500 F.3d 171, 183 (2d Cir. 2007) (citing *Dura*, 544 U.S. at 343-44).

[75]    *Id. Accord Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007) ("'Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'") (quoting *Lentell*, 396 F.3d at 172).

20

misrepresentations and omissions alleged by a disappointed investor."[76]

To establish loss causation, the loss must be foreseeable and the loss must be caused by the "materialization of the concealed risk."[77] "'[A] plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."[78] Thus, the Second Circuit has made clear that in order "[t]o plead loss causation, the complaints must allege facts that support an inference that [defendants'] misstatements and omissions concealed the circumstances that bear

---

[76] *Lentell*, 396 F.3d at 173. *Accord Lattanzio*, 476 F.3d at 157. In *Lattanzio*, the Second Circuit held that plaintiffs failed to allege a sufficient connection between the auditor's misstatements and the losses caused by the company's bankruptcy. The auditor's misstatements concealed the risk of the failure to conduct audits in accordance with generally accepted accounting practices, not the risk of the company's bankruptcy. *See id.* Thus, the court found that "if *Lentell's* 'zone of risk' could include the risk that an accountant would make a misstatement (by conducting an improper audit), then loss causation . . . would be completely subsumed by the element of misstatement." *Id.*

[77] *Lentell*, 396 F.3d at 173. *Accord Glidepath Holding B.V. v. Spherion Corp.,* No. 04 Civ. 9758, 2007 WL 2176072, at *16 (S.D.N.Y. July 25, 2007) ("A plaintiff has adequately pled loss causation with regard to the concealment or misstatement of a material fact if it alleges that its loss was foreseeable to the party alleged to have concealed or misrepresented the material fact and that its loss was caused by the materialization of the concealed (or misrepresented) fact.").

[78] *Lentell*, 396 F.3d at 173 (quoting *Suez Equity Investors*, 250 F.3d at 95 (emphasis added)).

upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud."[79]

There are several possible methods of pleading loss causation, including "direct causation,"[80] "materialization of risk,"[81] and "corrective disclosure."[82]  "[I]n a claim based on material misrepresentations and omissions, a plaintiff who cannot support an allegation of direct causation may do one of two things to sufficiently allege loss causation."[83]  "Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss," a plaintiff may plead that it is "the materialization of the undisclosed condition or event that causes the loss."[84]

---

[79]     *Id.* at 175.

[80]     *Id.* at 174 ("If that relationship [between 'the plaintiff's investment loss and the information misstated'] is sufficiently direct, loss causation is established. . . .").

[81]     *Id.* at 173 (requiring "that the loss be caused by the materialization of the concealed risk").

[82]     *Id.* at 175 n.4 (finding that plaintiffs could not establish loss causation because they alleged no corrective disclosures).

[83]     *Catton v. Defense Tech. Sys.*, No. 05 Civ. 6954, 2006 WL 27470, at *5 (S.D.N.Y. Jan. 3, 2006).

[84]     *In re Initial Public Offering Sec. Litig.*, No. 21 MC 92, 2005 WL 1529659, at *6 (S.D.N.Y. June 28, 2005). *Accord In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 678 (S.D.N.Y. 2007) ("In each of the cases in

"Alternatively, a plaintiff may identify particular 'disclosing event[s]'

that reveal the false information, and tie dissipation of artificial price inflation to

those events."[85] There is "no requirement that corrective disclosures emanate from

the company itself, so long as the truth is disclosed in some fashion."[86] Moreover,

there is no "requirement that the disclosure take a particular form or be of a

particular quality."[87]

It is not enough, however, for plaintiffs to allege merely that they

purchased securities at artificially inflated prices. As the Supreme Court explained

in *Dura*:

> For one thing, . . . at the moment the transaction takes
> place, the plaintiff has suffered no loss; the inflated
> purchase payment is offset by ownership of a share that *at*
> *that instant* possesses equivalent value. . . . Shares are
> normally purchased with an eye toward a later sale. But if,
> say, the purchaser sells the shares quickly before the

which the Second Circuit has employed a materialization of the risk analysis, it
has considered a particular risk that was allegedly concealed by the defendant's
actions and which then materialized to cause a market loss.") (citing cases).

[85]     *Catton*, 2006 WL 27470, at *5 (quoting *In re IPO*, 2005 WL
1529659, at *6). *Accord Lentell*, 396 F.3d at 175 n.4 (noting that corrective
disclosures "reveal to the market the falsity of the prior [statements]").

[86]     *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297 (S.D.N.Y.
2006) (citations omitted).

[87]     *In re Winstar Commc'ns*, Nos. 01 Civ. 3014, 01 Civ. 11522, 2006
WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006).

relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.[88]

## C. Securities Act – Section 11

"'[Section] 11 provides a cause of action for any person acquiring a

security issued pursuant to a materially false registration statement unless the

purchaser knew about the false statement at the time of acquisition.'"[89] A

misstatement under Section 11 is established when "material facts have been

---

[88] 544 U.S. at 342-43 (emphasis in original) (holding that plaintiffs failed to plead loss causation where their only allegation was the payment of artificially inflated prices for defendant's securities and their complaint failed to "provide[] defendants with notice of what [plaintiffs'] relevant economic loss might be or of what the causal connection might be between that loss and the [alleged] misrepresentation [at issue] . . . .").

[89] *Miles I*, 471 F.3d at 43 (quoting *DeMaria v. Andersen*, 318 F.3d 170, 175 (2d Cir. 2003)). *Accord Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case.").

24

omitted or presented in such a way as to obscure or distort their significance."[90]

Although fraud "is not an element or a requisite to a claim under Section 11," those claims "may be – and often are – predicated on fraud."[91] In such circumstances, Rule 9(b), which applies to "'all averments of fraud,'" will be applied.[92] The wording of Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."[93] Thus, although fraud is not an element of a claim under Section 11, where the claims are predicated on allegations of fraud, they will be subject to Rule 9(b).[94]

## IV. DISCUSSION

### A. Plausibility of the Allegations

Defendants argue that plaintiffs' claims must be dismissed because they are implausible. They contend that the scenario described by plaintiffs, where the market for hundreds of IPOs was manipulated with the knowledge of

---

[90]     *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991) (quotation omitted).

[91]     *Rombach*, 355 F.3d at 171.

[92]     *Id.* (quoting Fed. R. Civ. P. 9(b)).

[93]     *Id.*

[94]     *See id.*

25

thousands of market participants but without disclosure to investors, could not

exist. If thousands of participants knew of the Underwriter Defendants' market

manipulations, defendants argue, the market price would reflect that knowledge

and the manipulations would not have been successful.[95]

Plaintiffs have amended their complaints to narrow the scope of their

allegations regarding widespread knowledge.[96] As they observe, their allegations

---

[95]     *See* Memorandum of Law in Support of Issuer Defendants' Motion to
Dismiss the Second Consolidated Amended Complaints ("Issuer Defs. Mem.") at
6; Memorandum in Support of the Underwriter Defendants' Motion to Dismiss
("Underwriter Defs. Mem.") at 8.

[96]     Defendants argue that plaintiffs should be bound by their earlier
pleadings. However, statements in superseded pleadings are not conclusive
admissions (though they are still admissions for evidentiary purposes). *See United
States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984). *See also Kunglig
Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*, 32 F.2d 195, 198 (2d Cir. 1929)
("When a pleading is amended or withdrawn, the superseded portion ceases to be a
conclusive judicial admission; but it still remains as a statement once seriously
made by an authorized agent, and as such it is competent evidence of the facts
stated, though controvertible, like any other extrajudicial admission made by a
party or his agent."). *Compare Tho Dinh Tran v. Alphonse Hotel Corp.*, 281 F.3d
23, 32 (2d Cir. 2002) (affirming the district court's finding that the plaintiff
worked sixty-three hours per week despite the original complaint's allegations that
the plaintiff worked one hundred and sixteen hours per week and the first amended
complaint's allegations that he worked fifty-four hours per week), *overruled on
other grounds*, *Slayton v. American Exp. Co.*, 460 F.3d 215 (2d Cir. 2006), *with
Austin v. Ford Models, Inc.*, 149 F.3d 148, 155 (2d Cir. 1998) (affirming the
district court's refusal to permit a plaintiff to amend her complaint to omit certain
admissions), *abrogated on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S.
506 (2002).

26

"carefully cabin the persons alleged to have known about the fraud . . . ."[97]

Plaintiffs have also pled facts, including economic data, financial reporting, and

market behavior, that lend substantial supportive weight to their claims.[98] Viewed

as a whole, the allegations are sufficient to "'raise a right to relief above the

speculative level.'"[99]

## B.    Section 10(b) and Rule 10b-5 Claims

Plaintiffs have brought two claims under Section 10(b) and Rule 10b-

5 in connection with the alleged securities fraud.  The first, brought only against

the Underwriter Defendants, relates to market manipulation.  The second alleges

that all defendants made material misstatements and omissions in the registration

statements, either with an intentional or reckless state of mind, in violation of Rule

---

[97]    Plaintiffs' Memorandum of Law in Opposition to the Issuer and
Underwriter Defendants' Motions to Dismiss ("Pl. Mem.") at 41.  To the extent
that defendants argue that plaintiffs' factual allegations themselves are
implausible, the Court cannot consider that argument at this stage in the litigation.
The proper inquiry is whether, taking all facts alleged as true, there is a plausible
claim for relief.  *See Bell Atl.*, 127 S. Ct. at 1965 ("Factual allegations must be
enough to raise a right to relief above the speculative level on the assumption that
all the allegations in the complaint are true (even if doubtful in fact).") (citations
omitted).  *See also id.* ("[A] well-pleaded complaint may proceed even if it strikes
a savvy judge that actual proof of those facts is improbable . . . .").

[98]    *See generally* AMA ¶¶ 38-108.

[99]    *ATSI*, 493 F.3d at 98 (quoting *Bell Atl.*, 127 S. Ct. at 1965).

10b-5(b).  These claims must satisfy the requirements of the PSLRA.  Because these claims are related to the same underlying set of facts, I analyze them together.

### 1.    Particularity

Regarding the market manipulation claims, plaintiffs have alleged that the Underwriter Defendants "created artificial demand" for the securities in question "by conditioning share allocations in the IPO upon the requirement that certain customers agree to purchase shares . . . in the aftermarket and, in some instances, to make those purchases at pre-arranged, escalating prices."[100]  Plaintiffs have further alleged that the Underwriter Defendants manipulated the market price of the securities by issuing analyst reports that were unjustifiably positive.[101]  As a result of the manipulation, there were allegedly drastic price increases on the day of the IPOs.  These increases were allegedly "not the result of normal market forces," but rather "the result of Defendants' unlawful practices . . . ."[102]

Plaintiffs have met their burden.  They have alleged the manipulative acts (Tie-in Agreements and misleading analyst reports), the defendants that

---

[100]    Corvis Compl. ¶ 3.

[101]    *See, e.g., id.* ¶ 54.

[102]    *Id.* ¶ 33.

performed the acts (the underwriters for each IPO), the time at which the manipulative acts were performed (the agreements were made prior to the IPOs and the analyst reports were released shortly after the termination of the quiet periods), and the effect of the scheme on the market (the price of the securities was substantially inflated).

Plaintiffs' second claim, for material misstatements or omissions under Section 10(b), is essentially that defendants failed to disclose the market manipulation. Because plaintiffs have met their burden for pleading market manipulation, and because they have identified the specific false or misleading statements, they have also pled their Section 10(b) false statement claim with sufficient particularity.

### 2. Scienter

#### a. Underwriter Defendants' Scienter for Both Claims

In my February 19 Opinion, I held that plaintiffs had pled scienter on the part of the Underwriter Defendants for both Section 10(b) claims.[103] The Underwriter Defendants now move to dismiss on the grounds that plaintiffs' claims are not sufficiently particular to survive the heightened pleading requirements imposed by *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*

---

[103]    *See IPO I*, 241 F. Supp. 2d at 360.

29

("*Tellabs*").[104]

In the February 19 Opinion, I determined that "[t]he alleged conduct was so obviously manipulative (and material) that it could not have been done inadvertently."[105] I see no reason to reconsider this decision. Taking the facts pled as true, the inference of scienter on behalf of the Underwriter Defendants is at least as strong as any competing inference with regard to both the market manipulation claim and the false statement claim.

### b. Issuer Defendants' Scienter for the False or Misleading Statement Claim

In the February 19 Opinion, I determined that plaintiffs had not pled "strong circumstantial evidence that the Issuers engaged in conscious misbehavior or acted recklessly, sufficient to support a strong inference that they knowingly or recklessly made the specified misstatements and omissions in the registration

---

[104]     The Underwriter Defendants also move to dismiss on the ground that the Court's earlier decision was incorrect. *See* Underwriter Defs. Mem. at 34-35. As discussed above, I decline to revisit this ruling.

[105]     *IPO I*, 241 F. Supp. 2d at 360 (citation omitted). This finding did not apply to underwriters who were listed on the registration statements as underwriters but who were not alleged to have received share allocations. *See id.* at 361. However, I determined that their conduct clearly supported "a strong inference" of scienter for other reasons. *Id.*

statements."[106]  However, I held that plaintiffs had pled sufficient facts to demonstrate motive and opportunity, thus raising a sufficient inference of scienter, for certain Issuer Defendants.[107]  The Issuer Defendants now argue that the inference of motive is not strong enough to survive the heightened inquiry prescribed by *Tellabs*.

Plaintiffs offer three types of allegations to justify the inference that the Issuer Defendants had a motive to deliberately make the false or misleading statements at issue.  The first is that officers of the individual corporations had "substantial personal holdings in [the issuers'] common stock."[108]  Inflation of the share price would allow the officers "to sell personal holdings . . . at artificially inflated prices in the aftermarket or otherwise."[109]  For some issuers, this argument is enhanced by allegations that some of those officers sold portions of those holdings at inflated prices.[110]

---

[106]    *IPO I*, 241 F. Supp. 2d at 368.

[107]    There is no question that the issuers had an opportunity to engage in the alleged fraudulent activity.

[108]    FirePond Second Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws ("FirePond Compl.") ¶ 96(a).

[109]    *Id.* ¶ 96(b).

[110]    *See, e.g.,* Sycamore Compl. ¶ 129(b).

31

The second type of allegations centers on the use by some issuers of their shares "as currency in negotiating and/or consummating stock-based acquisitions after the IPO."[111] For example, FirePond is alleged to have acquired two corporations using in excess of three million shares.[112]

Finally, certain issuers are alleged to have sold additional shares at the artificially inflated prices. For example, two months after its IPO, Sycamore allegedly conducted a secondary offering of 10,200,000 shares at a price of $150.25 per share.[113]

In the February 19 Opinion, I held that plaintiffs had pled sufficient facts to demonstrate motive and opportunity, thus raising a sufficient inference of scienter, for those Issuer Defendants that were alleged to have used their securities as currency to acquire other corporations and for those Issuer Defendants alleged

---

[111]    FirePond Compl. ¶ 96(c).

[112]    *See id.*

[113]    *See* Sycamore Compl. ¶ 1. Defendants suggest that a stronger inference to be drawn from these facts is that Sycamore needed to raise additional capital because it was not profitable at the time. *See* Issuer Defs. Mem. at 22. While that is a plausible explanation for why Sycamore conducted an additional offering (indeed, it is the only plausible explanation), plaintiffs allege that it was precisely this need to raise additional capital that provided a motive for Sycamore to commit fraud. Plaintiffs essentially allege that Sycamore committed fraud because it needed capital. Explaining why it needed capital does not negate the inference of motive.

to have conducted secondary offerings.[114] I dismissed the claims against the other issuers, including defendant Corvis.[115]

The Issuer Defendants challenge the inclusion of allegations that an individual officer held shares of the company as evidence of motive. They correctly observe that generalized benefits that would inure to any shareholder or officer are insufficient to demonstrate scienter.[116] Allegations that corporate officers held the issuer's securities, taken alone, are insufficient to justify an adequately plausible inference of scienter. However, the Supreme Court has explained that "[t]he inquiry . . . is whether *all of the facts alleged, taken collectively,* give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."[117] The holdings of individual officers are therefore relevant to the question of scienter, though they are not dispositive. With regard to sales by officers of securities during the class

---

[114]   *See IPO I*, 241 F. Supp. 2d at 370.

[115]   *See id.* at 370-71 & app. 5C. Plaintiffs have raised no valid argument for reconsideration of this dismissal, and I decline to revisit the prior ruling.

[116]   *See Kalnit*, 264 F.3d at 142 (dismissing the complaint because "plaintiffs have not pointed to any specific benefit that would inure to the defendants that would not be either generalized to all corporate directors or beneficial to all shareholders, not just the defendant directors specifically").

[117]   *Tellabs*, 127 S. Ct. at 2509 (emphasis added).

33

periods, I held that "insider sales that represent less than ten percent of that insiders' total holdings are insufficiently 'unusual' to permit an inference of scienter."[118] I see no reason to depart from this principle here.

Plaintiffs do not raise all three types of allegations against all Issuer Defendants. However, plaintiffs do allege that each Issuer Defendant used its inflated shares as currency to acquire a target during the class period.[119] Additionally, defendants iXL and Sycamore allegedly raised additional capital through secondary offerings.[120] When these and other allegations against each issuer are viewed as a whole, they are sufficient to plead scienter in each case. An artificially inflated share price would permit the issuers to acquire other companies

---

[118]     *IPO I*, 241 F. Supp. 2d at 367.

[119]     *See* FirePond Compl. ¶ 96(c); iXL Compl. ¶ 125(b); Sycamore Compl. ¶ 129(c); Engage Second Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws ¶ 98(c); VA Software Second Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws ¶ 95(c). I disregard one of the FirePond acquisitions because it occurred after the end of the Class Period. Defendants argue that the other FirePond acquisition should be disregarded because it occurred at a time when FirePond's share price was below the offering price. However, the acquisition is relevant to demonstrate that at the time of its IPO, FirePond had a motive to inflate its share price – to strengthen its ability to acquire other companies. Whether FirePond actually succeeded in maintaining an artificially high share price long enough to acquire companies is irrelevant to the issue of motive.

[120]     *See* iXL Compl. ¶ 125(a); Sycamore Compl. ¶ 129(b).

34

with much lower expenditures of cash and securities than would otherwise be

required. This allegation, together with the allegations that corporate officers held

shares that significantly appreciated because of the Underwriter Defendants'

market manipulations[121] and the individual allegations made with respect to each

issuer, provide a sufficiently concrete motive to infer scienter on behalf of the

Issuer Defendants.

### 3. Transaction Causation (Reliance)

Plaintiffs allege that they relied on the market prices of the securities

in question and that those prices were distorted because of defendants' market

manipulations and the false statements that concealed those manipulations.[122]

Plaintiffs can only be presumed to have relied on the market prices if the market in

which they purchased their shares is efficient.[123]

---

[121]    The Issuer Defendants assert that plaintiffs' scienter allegations
against iXL are based solely on its use of its securities as currency to engage in
acquisitions. *See* Issuer Defs. Mem. at 12 tbl., 16-19. However, plaintiffs have
alleged that iXL and its officers "were motivated by the fact that the artificially
inflated price of [iXL's] shares in the aftermarket would enable the [officers] to
sell personal holdings in [iXL's] securities at artificially inflated prices in the
aftermarket or otherwise," and that iXL's officers earned in excess of $176 million
by selling securities in iXL's secondary offering. iXL Compl. ¶ 125(a).

[122]    *See, e.g.,* Corvis Compl. ¶ 68.

[123]    *See, e.g., Freeman v. Laventhol & Horwath*, 915 F.2d 193, 197 (6th
Cir. 1990) ("The fraud on the market theory rests on the assumption that the price

Defendants argue that *Miles I* held that the markets in question were not efficient. This is simply not accurate. *Miles I* addressed the primary market for IPO shares, not the secondary market on which plaintiffs allegedly purchased their shares. Quoting *Freeman v. Laventhol & Horwath*, the *Miles I* court stated that "[T]he market for IPO shares is not efficient. As the late Judge Timbers of our Court has said, sitting with the Sixth Circuit, '[A] *primary market* for newly issued [securities] is not efficient or developed under any definition of these terms.'"[124] However, plaintiffs allege that they purchased their shares not in the initial allocation, but on the secondary market that developed in the days and

---

of an actively traded security in an open, well-developed, and efficient market reflects all the available information about the value of a company.") (citation omitted). For definitions of the relevant economic terms, see *Cammer v. Bloom,* 711 F. Supp. 1264, 1276 n.17 (D.N.J. 1989) ("'An open market is one in which anyone, or at least a large number of persons, can buy or sell. . . . A developed market is one which has a relatively high level of activity and frequency, and for which trading information (*e.g.*, price and volume) is widely available. . . . An efficient market is one which rapidly reflects new information in price. These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.'") (quoting Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud* § 8.6 (1988)).

[124]   *Miles I*, 471 F.3d at 42-43 (quoting *Freeman*, 915 F.2d at 199) (emphasis added, second alteration in original).

weeks following the IPOs.[125]  In *Freeman*, the Sixth Circuit addressed a primary
market for municipal bonds.[126]  The bonds in question "were not traded actively in
an impersonal market," and the court observed that "the price of newly issued
securities is set primarily by the underwriter and the offeror, not by the market."[127]
By contrast, plaintiffs here purchased their securities from other investors on the
NASDAQ at the market price.

One sentence in *Miles I* does raise an issue as to the efficiency of the
aftermarket.  The Court wrote:  "As just one example of why an efficient market,
necessary for the *Basic* presumption to apply, cannot be established with an IPO,
we note that during the 25-day 'quiet period,' analysts cannot report concerning
securities in an IPO, thereby precluding the contemporaneous 'significant number
of reports by securities analysts' that are a characteristic of an efficient market."[128]
However, the only analysts whose reporting is restricted during the quiet period

---

[125]     *See, e.g.,* Corvis Compl. ¶ 12 ("Plaintiffs . . . purchased or otherwise
acquired shares . . . in the open market or otherwise during the Class Period . . .
.").

[126]     *See* 915 F.2d 193 (6th Cir. 1990).

[127]     *Id.* at 199.

[128]     *Miles I*, 471 F.3d at 42-43 (citations omitted) (quoting *Freeman*, 915
F.2d at 199).

37

are those affiliated with the issuer or underwriters of the securities.[129] Indeed,

plaintiffs have amended their complaints to indicate that the issuers in question

were "followed by numerous securities analysts and commentators before, during

and after the IPO, including during the 'quiet period' . . . ."[130]

The correct interpretation of *Miles I* is that it determined that the

primary market for IPO shares, the market formed by the issuer's sale of its

securities, is not efficient. As was the case with municipal bonds in *Freeman*,

there is little reason to believe that in a securities IPO the issuer and underwriters

would set an efficient price in the primary market.

This reading is supported by *Miles II*, where the circuit noted

plaintiffs' argument that "non-allocants of shares in the various initial public

offerings . . . who purchased shares in the aftermarket, as distinguished from

allocants who purchased shares in the IPOs, would have relied on the market price

of the shares," but concluded that "whatever its merit, [this argument] provides no

basis for revising our ruling with respect to the broad class certified by the District

Court."[131] Clearly the panel did not believe that *Miles I* foreclosed the possibility

---

[129]    *See* 17 C.F.R. §§ 230.174(d), 242.101(a).

[130]    Corvis Compl. ¶ 68(e).

[131]    483 F.3d at 72.

of efficiency in the aftermarket, only in the primary market. With this in mind, I turn to plaintiffs' allegations regarding the efficiency of the secondary market for IPO shares.

The Second Circuit has not adopted a test or method for determining whether the market for a security is efficient.[132] Nonetheless, the record in this case contains several strong indications that the market in which the focus stocks traded was efficient. Two facts stand out as particularly probative: *first*, all the focus stocks were traded on the NASDAQ National Market, an open and generally

---

[132] The *Cammer* court identified five factors that would be useful in proving an efficient market: (1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases. *See* 711 F. Supp. at 1286-87. The *Cammer* test is "widely-accepted" by federal courts throughout the country. *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 4 (1st Cir. 2005). *See, e.g., In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 508 (1st Cir. 2005) (adopting the *Cammer* approach); *Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999) (same); *Hayes v. Gross*, 982 F.2d 104, 107 (3d Cir. 1992) (same); *Freeman*, 915 F.2d at 199 (same); *In re SCOR Holding (Switzerland) AG Litig.*, No. 04 Civ. 7897, — F. Supp. 2d —, 2008 WL 608606, at *14 (S.D.N.Y. Mar. 6, 2008) (same). *But see Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) (employing additional factors from *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001)); *O'Neil v. Appel*, 165 F.R.D. 479, 503-05 (W.D. Mich. 1996) (suggesting additional factors from the economic literature to supplement the *Cammer* approach).

39

highly active market;[133] and *second*, the focus stocks were allegedly the subjects of

numerous analyst reports and extensive media coverage.[134]  Plaintiffs further

allege that "[t]he market rapidly assimilated information about the Issuer[s] which

was publicly available . . . and that information was promptly reflected in the price

of the Issuer[s'] common stock . . . ."[135]  Under any reasonable test for market

efficiency, these facts are sufficient to make plaintiffs' allegation that the stocks

---

[133]    One court in this circuit has held that early in the litigation, "[f]or
stocks . . . that trade on a listed exchange such as NASDAQ, [the] reliance element
of a 10b-5 cause of action is presumed." *Stevelman v. Alias Research*, No. 5:91-
CV-682, 2000 WL 888385, at *4 (D. Conn. June 22, 2000).  While other courts
have been reluctant to conclude that a stock was traded efficiently solely because
it was traded on the NASDAQ, the federal courts are unanimous in their
agreement that a listing on the NASDAQ or a similar national market is a good
indicator of efficiency. *See, e.g., Levine v. Skymall, Inc.*, No. Civ. 99-166, 2002
WL 31056919, at *5 (D. Ariz. May 24, 2002) ("Although not dispositive, the fact
that SkyMall stock is traded on the NASDAQ stock market's National Market
System also contributes to finding that the market is efficient."); *RMED Int'l v.
Sloan's Supermarkets*, 185 F. Supp. 2d 389, 404-05 (S.D.N.Y. 2002) ("Indeed,
research has failed to reveal any case where a stock traded on the AMEX was
found not to have been traded in an open and efficient market. . . . Rather, to the
contrary, numerous courts have held that stocks trading on the AMEX are almost
always entitled to the presumption.") (citations omitted); *O'Neil*, 165 F.R.D. at
504 ("The market system upon which a particular stock trades provides some
insight as to the likelihood that the market for that stock is efficient . . . .").

[134]    *See, e.g.,* FirePond Compl. ¶ 63(e) ("[FirePond] was followed by
numerous securities analysts and commentators before, during, and after the IPO,
including the 'quiet period' . . . .").

[135]    *Id.* ¶ 63(f).

40

traded on an efficient market plausible.

Ultimately, whether the relevant markets were efficient is a question of fact to be resolved at trial.[136] The present finding – that plaintiffs have made a sufficient showing that the focus markets were efficient – is solely for the purposes of adjudicating the pending motion to dismiss and is not binding on the finder of fact. Based on the evidence presented at trial, the finder of fact may conclude that the relevant markets were efficient, in which case plaintiffs will benefit from a presumption of reliance. On the other hand, the finder of fact may conclude that one or more of the relevant markets was inefficient, in which case

---

[136]    *See, e.g., Basic*, 485 U.S. at 249 n.29 ("Proof [rebutting a presumption of reliance] is a matter for trial . . . . Thus, we see no need to engage in the kind of factual analysis the dissent suggests that manifests the 'oddities' of applying a rebuttable presumption of reliance in this case.") (citations omitted); *DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 121 (S.D.N.Y. 2004) ("It is not for the Court to decide, on a motion to dismiss, . . . whether or to what extent the market functioned efficiently. [That is an] issue[] of fact for trial."); *In re Ashanti Goldfields Sec. Litig.*, No. CV 00-0717, 2004 WL 626810, at *16 (E.D.N.Y. Mar. 30, 2004) ("[P]roof of market inefficiency . . . or rebuttal of the presumption of reliance is best left to the trial phase of litigation.") (citing *Basic*, 485 U.S. at 248 n.29) (other citations omitted); *RMED Int'l v. Sloan's Supermarkets*, No. 94 Civ. 5587, 2002 WL 31780188, at *4 (S.D.N.Y. Dec. 11, 2002) ("Whether or not a market for a stock is open and efficient is a question of fact.") (citing *In re Laser Arms Corp. Sec. Litig.*, 794 F. Supp. 475, 490 (S.D.N.Y. 1989)); *In re Laser Arms Corp.*, 794 F. Supp. at 490 (holding that "[w]hether in fact Laser Arms traded in an efficient market is a question of fact. Therefore, resolution of that issue must await presentation of further proof at trial."), *aff'd*, 969 F.2d 15 (2d Cir. 1992).

41

those plaintiffs who traded in such markets would be required to make individual

showings of reliance. This determination is also not binding for purposes of class

certification. It is possible that although the market for these securities may have

become efficient after a certain period of time, plaintiffs who purchased shares

immediately after the IPO would face different factual issues in demonstrating that

the market was efficient at the time of their purchase.

## 4. Loss Causation

Regarding the market manipulation claims, in the February 19

Opinion, I determined that plaintiffs "pled, with significant particularity, an

extensive and coherent scheme of loss causation."[137] Expanding on that decision

in response to defendants' motion for judgment on the pleadings,[138] I explained

that "[t]he gravamen of plaintiffs' complaint is that the Underwriters manipulated

the IPO market to drive up the price of securities, knowing that they were causing

the securities to be overvalued and that the stock prices would eventually recede to

---

[137]   *IPO I*, 241 F. Supp. 2d at 378.

[138]   After I issued the February 19 Opinion, the Second Circuit issued its
decision in *Emergent Capital Investment Management, LLC v. Stonepath Group,
Inc.*, 343 F.3d 189 (2d Cir. 2003), which clarified the standard for pleading loss
causation. In light of this decision, defendants renewed their motion to dismiss on
the specific issue of loss causation. *See In re Initial Public Offering Sec. Litig.*
(*"IPO III"*), 297 F. Supp. 2d 668, 675 (S.D.N.Y. 2003) (denying the renewed
motion).

42

reflect the actual value of the securities, thereby injuring innocent investors. That is loss causation."[139] I see no reason to revisit this conclusion.

Regarding the misstatement claims, I observed that normally dissipation cannot be inferred from misstatements and omissions.[140] In this situation, however, where "the misstatements and omissions did nothing more than conceal the Underwriters' alleged market manipulation," I held that the misstatements could also be considered a cause of the loss caused by the manipulation.[141]

Defendants now move to dismiss on the ground that the allegations do not meet the heightened standard prescribed by the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo* and expanded upon by the Second Circuit in *Lentell v. Merrill Lynch & Co.* and *Lattanzio v. Deloitte & Touche LLP.*[142] Specifically, defendants argue that plaintiffs' inability to identify an explicit event that caused the market price to fall prevents them from pleading loss causation.

These intervening cases do not support a reversal of my earlier

---

[139]  *IPO III*, 297 F. Supp. 2d at 675.

[140]  *See id.*

[141]  *Id.*

[142]  *See supra* notes 73-82 and accompanying text.

43

decision. In *Dura*, the Supreme Court determined that a plaintiff who pled a pure misrepresentation claim had to explain how the misrepresentations caused her loss, and could not rely on an inference that artificial inflation of the share price would dissipate over time.[143] *Lentell*, also a pure misrepresentation claim, reached a similar conclusion. But here, plaintiffs allege that their losses were caused by market manipulations, and the false statements simply obscured those manipulations. This is not a pure misrepresentation case and should not be held to the standards that apply to such cases.

Although these cases are not directly on point, they do provide relevant principles for resolution of the loss causation issue presented here. In *Lentell*, the Second Circuit determined that "the complaints must allege facts that support an inference that [the defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud."[144] The court further compared loss causation to proximate cause, and determined that the loss must be "within the zone of risk concealed by the misrepresentations . . .

---

143    *See Dura*, 544 U.S. at 338.

144    *Lentell*, 396 F.3d at 175.

alleged by a disappointed investor."[145]  Here, the misstatements and omissions

concealed the alleged market manipulation that caused plaintiffs' losses, and

without such misstatements and omissions, plaintiffs' losses would not have

occurred.  Further, plaintiffs' losses are those that could be expected to result from

the concealment of the market manipulation scheme.  Plaintiffs have thus pled loss

causation.

## C.   Section 11 Claims

Defendants move to dismiss plaintiffs' Section 11 claims on the

grounds that the claims are not pled with sufficient particularity and that certain

plaintiffs are unable to trace their shares to the IPO.  Because plaintiffs have

adequately pled their Section 10(b) claims and because their Section 11 claims

involve the same conduct, plaintiffs have also stated a claim under Section 11.

The parties disagree about whether Rule 9(b) applies to plaintiffs'

Section 11 claims against the Issuer Defendants.[146]  In the February 19 Opinion, I

held that plaintiffs' Section 11 claims were "'grounded' in their fraud claims," but

---

[145]   *Id.* at 173 (emphasis omitted).

[146]   Plaintiffs concede that their Section 11 claims against the Underwriter
Defendants must be pled in accordance with the standard of Rule 9(b).  *See* Pl.
Mem. at 74.

45

that the heightened pleading standard does not apply.[147]  Since that time, however,

the Second Circuit has determined that "while a plaintiff need allege no more than

negligence to proceed under Section 11 . . . , claims that do rely upon averments of

fraud are subject to the test of Rule 9(b)."[148]

I find that the Section 11 claims against the Issuer Defendants sound

in negligence and are thus subject only to Rule 8(a).  While the Underwriter

Defendants are alleged to have committed deliberate fraud to inflate the price of

the IPO shares, the only explicit accusation of wrongdoing by the Issuer

Defendants is that they "issued, caused to be issued and participated in the

issuance of materially false and misleading written statements and/or omissions of

material fact to the investing public that were contained in the Registration

Statement."[149]  While plaintiffs also allege that the Issuer Defendants acted

"knowingly or recklessly" when they distributed the registration statements into

the market,[150] plaintiffs' Section 11 claims are not reliant on the participation of

the Issuer Defendants in the alleged fraud.  Therefore, while plaintiffs' allegations

---

[147]     *IPO I*, 241 F. Supp. 2d at 341.

[148]     *Rombach*, 355 F.3d at 171.

[149]     Corvis Compl. ¶ 62.

[150]     *Id.* ¶ 95.

46

against the Underwriter Defendants must meet the pleading standards of Rule 9(b), the allegations against the Issuer Defendants must only meet those of Rule 8(a). However, regardless of which pleading standard applies, plaintiffs have met their burden.

## 2. Damages

"If a plaintiff has no conceivable damages under Section 11, she cannot state a claim upon which relief can be granted and her Section 11 claims must be dismissed."[151] Section 11(e) provides that the appropriate measure of damages is the difference between the price for which the securities were sold and "the amount paid for the security (not exceeding the price at which the security was offered to the public) . . . ."[152] Because a plaintiff who sold her securities at a price exceeding the offering price could not have incurred any cognizable damages even if she actually purchased the securities at a higher price (thus sustaining a loss on the transaction), I dismissed all Section 11 claims brought by plaintiffs who sold their securities at prices above the offering price.[153] There is no reason to revisit this holding. I therefore again dismiss all Section 11 claims

---

[151]   *IPO I*, 241 F. Supp. 2d at 347 (citing Fed. R. Civ. P. 12(b)(6)).

[152]   15 U.S.C. § 77k(e).

[153]   *See IPO I*, 241 F. Supp. 2d at 347-51.

brought by plaintiffs who sold their securities above the offering price.

### 3. Tracing

In ruling on the motion for class certification, I determined that the class periods for plaintiffs' Section 11 claims could not extend beyond when shares not traceable to the IPO entered the market. In the absence of such a limitation, I concluded that the inquiry as to whether each plaintiff's shares were traceable to the IPO would predominate over common issues.[154] The Underwriter Defendants now move to dismiss the claims of those plaintiffs who purchased their shares after the dates on which non-IPO shares entered the market. The Underwriter Defendants misapprehend the earlier ruling. While I determined at that time that plaintiffs who purchased after these dates could not be part of the certified classes, I did not hold that they failed to state a claim as a matter of law. Those plaintiffs are entitled to show that their shares are traceable to the IPO notwithstanding their date of purchase.

### D. Statute of Limitations

#### 1. New Plaintiffs

Plaintiffs Getman, Levy, and Belcore have been added to the

---

[154]     *See IPO II*, 227 F.R.D. at 118-19.

Sycamore Complaint.[155] Defendants move to dismiss these plaintiffs on the ground that their claims are time barred.

Putative plaintiffs are required to file their claims within one year of the time they could have discovered, by means of reasonable diligence, the facts that gave rise to the action.[156] However, "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action. Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied."[157] Under this doctrine, first explained in *American Pipe & Construction Co. v. Utah*, plaintiffs' time to file was tolled as of July 2, 2001, the date on which the Sycamore case was filed.[158]

---

[155] *See* Sycamore Compl. ¶ 15.

[156] *See Shah v. Meeker*, 435 F.3d 244, 248-49 (2d Cir. 2006) (discussing claims under Section 10(b)); *In re WorldCom Sec. Litig.*, 496 F.3d 245, 249 (2d Cir. 2007) (discussing claims under Section 11).

[157] *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353-54 (1983) (quotation omitted).

[158] *See* 414 U.S. 538, 554 (1974). Defendants argue that the tolling ended when the Second Circuit denied class certification in *Miles I*. I have already ruled otherwise, *see In re Initial Public Offering Sec. Litig.* ("*IPO IV*"), No. 21 MC 92, 2007 WL 2609585, at *3 (S.D.N.Y. Aug. 30, 2007), and decline to revisit that decision.

The Underwriter Defendants argue that plaintiffs should have been on notice in 1999, more than one year before the action was filed, and cite as evidence several news articles. Establishing inquiry notice as a matter of law is a "'heavy burden . . . . Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct.'"[159] The few instances of press coverage cited by defendants that occurred before July 2, 2000 are insufficient to support such a finding.

## 2. Cessation of *American Pipe* Tolling

Defendants also move to dismiss the Section 11 claims of certain new Sycamore plaintiffs on the ground that because they were not part of the class certified by this Court on October 13, 2004, any tolling under *American Pipe* ended on that date.[160] On that date, the Court certified the Sycamore class but limited it to those plaintiffs who purchased their shares between October 21, 1999 and January 19, 2000 (from the date of the IPO to the date when shares not traceable to the IPO entered the market).[161] Levy asserts that he purchased

---

[159] *Newman v. Warnaco Group*, 335 F.3d 187, 194-95 (2d Cir. 2003) (quoting *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 249 (S.D.N.Y. 1993)).

[160] *See* Underwriter Defs. Mem. at 49-50.

[161] *See IPO II*, 227 F.R.D. at 118-20.

Sycamore shares on October 25, 2000 and November 6, 2000.[162] Belcore asserts that she purchased Sycamore shares on January 5, 2000.[163] Getman asserts that he purchased Sycamore shares on October 6, 2000.[164] Thus, only Belcore was within the certified class.

The claims of Getman and Levy are time barred. When I certified the Sycamore class, those plaintiffs who were not members of that class could no longer rely on the action to protect their interests.[165] As a result, the tolling extended to them under *American Pipe* ceased.

However, Belcore's claim is not time barred. In an earlier Opinion, I determined that "for . . . putative class members, it remains reasonable for them to rely on these actions continuing as class actions and on their inclusion in those class actions unless and until this Court (or a higher court) definitively denies the pending motion for class certification."[166] Because the possibility of a class that

---

[162]    *See* Certification of Plaintiff George Levy, Ex. J to Declaration of Christian Siebott in Support of Plaintiffs' Motion for Class Certification in Six Focus Cases Vol. 8 ("Siebott Decl.").

[163]    Certification of Plaintiff Deborah Belcore, Ex. K to Siebott Decl.

[164]    Certification of Plaintiff Harlan Getman, Ex. L to Siebott Decl.

[165]    Plaintiffs did not cross-appeal this Court's decision to limit the Sycamore class period.

[166]    *IPO IV*, 2007 WL 2609585, at *3.

includes Belcore remains open, tolling of the statute of limitations with respect to her Section 11 claims remained in effect.

## E. iXL Bankruptcy Injunction

iXL merged with a subsidiary of Scient, Inc. in November of 2001, and subsequently filed a voluntary Chapter 11 bankruptcy petition.[167] At the conclusion of the bankruptcy proceeding, the debtors were dissolved and the bankruptcy court entered an Order that enjoined certain actions against iXL's successors (the "iXL Order").[168] Issuer Defendants move to dismiss the iXL action on the ground that it violates this Order.

The iXL Order enjoins all claims against the debtors and their successors "based in whole or in part upon any act or omission . . . taken in connection with the Debtors' chapter 11 cases . . . ."[169] The iXL action has no connection to iXL's chapter 11 filing. Dismissal on this ground is therefore

---

[167]     *See In re Scient, Inc.*, No. 02-13455 (Bankr. S.D.N.Y. filed July 16, 2002).

[168]     *See* Order (I) Authorizing the Debtors to Make a Distribution to Holders of Allowed Administrative Claims and, to the Extent Funds Are Available, to Priority Claims, (II) Dismissing the Debtors' Chapter 11 Cases Effective upon the Filing of a Final Certificate of Distribution with the Court, and (III) Granting Related Relief ¶ 24, *In re Scient, Inc.*, No. 02-13455 (Bankr. S.D.N.Y. Dec. 20, 2006).

[169]     *Id.*

52

denied.

### F.    Leave to Replead

Defendants' motion to dismiss has been granted only as to those Section 11 claims raised by plaintiffs who did not suffer cognizable damages and those Section 11 claims that are time barred. No reasonable amendment to the complaints could cure this deficiency. Leave to replead is therefore denied.

## V.    CONCLUSION

For the reasons stated above, defendants' motion is granted in part and denied in part. Claims brought under Section 11 by those plaintiffs who sold their securities for a price in excess of the initial offering price and by those plaintiffs who purchased outside the previously certified class period are dismissed. The Clerk of the Court is directed to close these motions [documents no. 5700 and 5705 in action 21 MC 92].

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          March 26, 2008

53

## - Appearances -

## For Plaintiffs' Executive Committee:

Stanley D. Bernstein, Esq.
Robert Berg, Esq.
Rebecca M. Katz, Esq.
Christian Siebott, Esq.
Ann M. Lipton, Esq.
Bernstein Liebhard & Lifshitz, LLP
10 East 40th Street
New York, New York 10016
(212) 779-1414

Robert A. Wallner, Esq.
Ariana J. Tadler, Esq.
Peter G.A. Safirstein, Esq.
Milberg Weiss Bershad & Schulman LLP
One Pennsylvania Plaza
New York, New York 10119
(212) 946-9453

## Liaison Counsel for Underwriter Defendants:

Gandolfo V. DiBlasi, Esq.
Penny Shane, Esq.
David M.J. Rein, Esq.
Richard J.L. Lamuscio, Esq.
Sullivan and Cromwell LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

**Liaison Counsel for Issuer Defendants:**

Jack C. Auspitz, Esq.
Joel C. Haims, Esq.
Hilary M. Williams, Esq.
Angela T. Rella, Esq.
Reema S. Abdelhamid, Esq.
Morrison and Foerster LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 468-8000