USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/8/11

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------X

IN RE INITIAL PUBLIC OFFERING
SECURITIES LITIGATION

-----------------------------------------------------

This document relates to all cases.

-----------------------------------------------------X

**OPINION AND ORDER**

**21 MC 92 (SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

On October 8, 2010, the firm of Bernstein Liebhard LLP, acting on

behalf of the Executive Committee,[1] distributed a revised fee allocation proposal

(the "Proposal") among plaintiffs' counsel. Of the fifty-nine plaintiffs' firms that

were involved in prosecuting this multi-district litigation, two non-lead plaintiffs'

firms objected to the Proposal: Siemion Huckabay, P.C. ("Siemion") and Johnson

& Perkinson ("J&P") (collectively, the "Objectors"). In response to the issues

raised by the Objectors, I ordered the EC to prepare a spreadsheet showing the

allocation of total fees of $170,084,950.00 based on the "revised adjusted

---

[1]     At the outset, this Court appointed the following six firms to the
Executive Committee to serve jointly as lead counsel: (1) Bernstein Liebhard LLP
("Bernstein"); (2) Milberg LLP; (3) Barroway Topaz Kessler Meltzer & Check,
LLP; (4) Sirota & Sirota; (5) Stull Stull & Brody; and (6) Wolf Haldenstein Adler
Freeman & Herz LLP. Another four firms were appointed to a Steering Committee
to assist the Executive Committee in the management of the litigation, the most
active of which was Lovell Stewart Halebian LLP ("Lovell"). Lovell's
participation in this litigation, including its substantive contributions and risks
assumed, matched that of the six Executive Committee member firms. Lovell and
the above six firms will be referred to collectively as the "EC," the "EC firms," or
"Lead Counsel."

lodestars" of both the EC and non-EC firms.[2]  In response to the Order, Bernstein

submitted a letter to this Court dated June 23, 2011 (the "Bernstein Letter").

Attached to the Bernstein Letter is a spreadsheet that complies with the directives

set forth in the Order (the "Spreadsheet").[3]  The Spreadsheet is appended to this

Opinion and Order as Exhibit A.

After reviewing the Spreadsheet in detail and the submissions made

by the Objectors and Lead Counsel, I hereby order that fees to the non-EC firms be

allocated in accordance with the Spreadsheet as follows: where the amount in

Column G is greater than the amount in Column H, the firm will be allocated the

amount in Column G; where the amount in Column G is less than the amount in

Column H, the firm will be allocated the amount in Column H.  The sum of the

differences between Column H and Column G, for those non-EC firms allocated

the amounts in Column H,[4] will be referred to as the "Shortfall."   The Shortfall

will be deducted from the total fee allocation to the EC firms.  I hereby further

---

[2]     *See* 6/15/11 Order (Document # 6283 on the ECF docket) (hereinafter, the "Order").

[3]     Bernstein unilaterally decided to include one more column, Current Proposed Allocation, in Column H.  According to the Bernstein Letter, Column H "takes into account several non-lodestar based adjustments and the various *inter se* agreements among Plaintiffs' Counsel[.]" Bernstein Letter at 2.

[4]     These firms include: Spector; Abraham; Piven; Neuwelt; Stamell; Weinstein; Labaton; Mager; Frydman; Weiss; Finkelstein; and Kirby.

ORDER that the EC firms will be allocated the total amount of fees in Column G less the Shortfall.[5]  The EC firms may allocate the total fees allocated to the EC in Column G, less the Shortfall, among its constituent members in any manner they see fit.  For both EC and non-EC firms, the allocation of reimbursable expenses and interest will be the same as set forth in the Proposal.

For the following reasons, the Court finds the allocation methodology outlined above to be the fairest to all firms.

## I.   Background of the IPO Securities Litigation

"This litigation will certainly go down in history as one of the longest and most protracted multi-district securities litigations in the country."[6]  Beginning in January 2001, over 1,000 complaints were filed against 55 underwriters, over 300 issuers, and 1,000 officers and directors of the issuers.  Over the ensuing decade, plaintiffs' counsel submitted more than 300 amended pleadings in 309 class actions, successfully opposed a motion for this Court's recusal, defended

---

[5]      It appears that Lead Counsel has already agreed to this adjustment as the Bernstein Letter states that "the actual fee allocations proposed for the EC firms will be reduced, as they do not reflect the amounts due to be paid solely out of the EC's share of the fee allocation to the numerous objectors' counsel that were part of an agreement reached in July 2010 to resolve the appeals from the final order approving the settlements."  Bernstein Letter at 2.  Deducting the Shortfall from the EC firms fees merely effectuates this understanding.

[6]      *In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 467, 508 (S.D.N.Y. 2009).

against numerous motions to dismiss, and briefed and argued three contested class certification motions (before the district court, on appeal, and then again on remand). A billion dollar settlement guarantee was forged and scuttled. Plaintiffs' counsel served over 600 third-party subpoenas, reviewed over thirty million pages of documents obtained through discovery, took and defended 145 depositions (both domestically and internationally), and retained multiple experts. Lead Counsel also briefed numerous procedural and substantive motions, resulting in this Court's issuance of over thirty opinions.

### A.    Division of Work Between Lead and Non-Lead Counsel

As Lead Counsel from the litigation's inception in 2001, the EC invested substantial resources while incurring the significant risk that it would never be compensated for its time and effort. The EC was responsible for all tasks, large and small, including:

- Drafting original and amended pleadings in hundreds of cases;

- Briefing a recusal motion;

- Briefing multiple rounds of motions to dismiss;

- Briefing an appeal;

- Briefing multiple discovery motions;

- Briefing settlement approval motions and responding to objections;

4

- Serving and responding to scores of discovery requests;

- Taking scores of depositions throughout the United States and Europe;

- Leasing major office space and establishing a documentary repository;

- Reviewing more than thirty million documents;

- Supervising attorneys and other personnel from dozens of law firms;

- Hiring multiple experts on various topics ranging from judicial ethics to loss causation;

- Delegating tasks to other law firms and supervising their work;

- Deposing experts and defending expert depositions;

- Conducting multiple sophisticated mediation sessions;

- Conducting a complex mock trial;

- Negotiating multiple settlements with hundreds of attorneys from highly-esteemed law firms worldwide;

- Devising a plan to divide settlement proceeds among 309 cases and within each case; and

- Helping determine the fair and reasonable allocation of the aggregate attorneys' fee award.

By the time the application for attorneys' fees and expenses was submitted in 2009, the EC firms had accumulated over 677,000 hours of attorney time.  The remaining non-EC firms had collectively billed just over 350,000 hours.  The EC alone incurred approximately $43 million in expenses, including $20

5

million for Lexecon, the plaintiffs' damages expert, and over $10.5 million for the plaintiffs' litigation fund. The EC's efforts resulted in a submitted lodestar of approximately $278 million. The remaining non-EC firms sought reimbursement of approximately $7.5 million in expenses, resulting in a total submitted lodestar of approximately $119 million.

### 1. Lead Plaintiff Motions, Amended Complaints, and Motions to Dismiss

Following its appointment, the EC wrote more than three hundred amended complaints and the master allegations, drafted opposition briefs to the numerous motions to dismiss, and entered into mediation to negotiate an agreement in principle to settle with the Issuer Defendants. Under the EC's leadership, non-EC firms were assigned specific tasks to support these efforts.

### 2. Discovery

Discovery in this case was a monumental undertaking that began with defendants' production of nearly thirty million pages of documents in early 2003. To coordinate discovery, the EC rented office space in midtown Manhattan and requested that dozens of non-EC firms provide manpower to review documents and conduct discovery. By establishing this document repository, the EC maximized resources, focused efforts, ensured quality control, avoided duplicative discovery efforts, and improved communication from the EC to the non-EC firms

and from plaintiffs' counsel to class members.  At its peak, more than one hundred

lawyers were working at the document repository daily.  On behalf of the EC,

Bernstein and Milberg oversaw the day-to-day operation of the repository and

other discovery efforts for over four years.

To streamline discovery, the EC assembled teams of lawyers to focus

on certain discovery targets.  Various teams were each assigned a single defendant,

who presented the most significant, labor-intensive discovery (*e.g.*, there was a

Morgan Stanley team, a Credit Suisse First Boston team, a Goldman Sachs team,

*etc.*).  Other discovery teams were created with one team focusing on a group of

smaller underwriter defendants considered less critical, one team on third parties,

and another on Issuer Defendants.  Certain lawyers, who assisted in supervising

these teams, were referred to as "team leaders."

### 3. Class Certification

With discovery ongoing, the EC filed a motion for class certification.

The EC and defense counsel, with the Court's approval, selected six "focus" cases

to facilitate the resolution of issues common to the IPO litigation.  The class

certification process involved extensive briefing over several months that included

responding to over seven expert reports.  In October 2004, this Court certified the

classes in all six focus cases.[7]   On appeal, the Second Circuit reversed, setting

forth a heightened standard of proof for Federal Rule of Civil Procedure 23

certification motions.[8]   This Court noted that *Miles I* "appeared to close the door on

any opportunity for class certification in th[e IPO] cases."[9]

   The impact of the appellate decertification cannot be understated, as

"the risk of *losing it all* was heightened with the Second Circuit's decision in *Miles*

*I*."[10]   After nearly five years of litigating, with the preliminary settlement scuttled

and prospect of successfully certifying 309 classes dwindling, many non-lead firms

withdrew from the litigation — some in the amount of resources, others entirely.

For example, Siemion billed a total of 2.15 hours to the IPO litigation after *Miles I*.

Undeterred, the EC moved for an *en banc* rehearing.   On April 6, 2007, a Second

Circuit panel denied the request, but found that plaintiffs' counsel could move to

recertify under a narrower class definition.[11]   In response, the EC resumed

litigating by fully briefing a renewed certification motion with a redefined class

---

[7] *See In re IPO*, 227 F.R.D. 65 (S.D.N.Y. 2004).

[8] *Miles v. Merrill Lynch & Co.* (*In re IPO*) ("*Miles I*"), 471 F.3d 24 (2d Cir. 2006).

[9] *In re IPO*, 671 F. Supp. 2d at 472.

[10] *Id.* at 509 (emphasis added).

[11] *Miles v. Merrill Lynch & Co.* (*In re IPO*) ("*Miles II*"), 483 F.3d 70 (2d Cir. 2007).

and supporting expert reports.

In 2008, following nine months of negotiations, seven full mediation sessions, and "countless" phone conferences and other meetings, the parties reached a revised settlement.[12]   To effect this settlement, the EC narrowed the scope of eligible class members to meet the Second Circuit's heightened burden of proof set forth in *Miles I*.  In April 2009, this Court granted preliminary approval of the parties' joint agreement to settle and, in so doing, held that the revised class definition satisfied the Rule 23 certification requirements for all 309 IPO stocks.[13]

### 4.      Settlement and Aggregate Attorneys' Fee Award

Eight years after the litigation commenced, in October 2009, this Court granted plaintiffs' motions for final approval of a $586 million class settlement and aggregate attorneys' fee and expense award of approximately $170 million.[14]   At an April 2, 2010 conference, the Court directed the EC to propose an allocation of the aggregate fee award among the fifty-nine plaintiffs' firms that were involved in this litigation.

---

[12]     *In re IPO*, 260 F.R.D. 81, 116 (S.D.N.Y. 2009).

[13]     *Id.* at 120.

[14]     *In re IPO*, 671 F. Supp. 2d 467.

On June 9, 2010, the EC circulated the first fee allocation proposal to non-EC counsel, detailing the methodology used to apportion fees and expenses for each firm. Following discussions between the EC and non-lead firms, on October 8, 2010, the EC distributed the revised Proposal to non-EC counsel, including a step-by-step description of the allocation methodology and the projected fee and expense award for each firm.[15]

**B.    The Proposal's Fee Allocation Methodology**

To fairly allocate reasonable attorneys' fees and reimbursement of expenses, the Proposal considered both EC and non-EC counsel's requested lodestars, as well as the roles assumed, contributions made, time and labor expended, magnitude and complexity of assignments executed, relative risks undertaken, and quality of work performed.[16] In particular, the fee allocation methodology weighed the following factors:

---

[15]    *See* Ex. A (Proposal) to the Declaration of Stanley D. Bernstein in Opposition to the Objections to the Fee Allocation Proposal and Requests for Additional Fees and Expenses ("Bernstein Decl."). The Proposal expressly notified the non-EC firms that the EC's requested fees underwent "identical average lodestar and time categorization analysis" as that applied to non-EC counsel; however, the resulting sum would be allocated pursuant to a separate, previously negotiated agreement. This agreement, dated June 9, 2010, allocates the EC's aggregate fee award among the seven Lead Counsel firms.

[16]    *See* Proposal at 1.

(1) whether the firm met its litigation fund obligations; (2) whether attorneys from the firm were assigned supervisory responsibilities or other leadership roles; (3) whether the firm remained demonstrably committed to the case after the reversal of class certification in *Miles v. Merrill Lynch*; and (4) whether the firm was appointed by the Court to the Executive or Steering Committees.[17]

The Proposal employed the following methodology. *First*, the Proposal assigned an "average lodestar" to all firms. Each firm's "average lodestar" was calculated using the average of the original hourly rates submitted by each firm and the hourly rates used for purposes of allocating the aggregate fee award.[18] *Second*, the "average lodestar" was subject to certain reductions following a review of each firm's daily time records. Questionable hours were either reduced or entirely eliminated.[19] For each firm that formally and affirmatively abandoned the case, the total hours submitted was halved. *Third*, to arrive at an "average total lodestar" for each firm, all hours remaining

---

[17]     *Id.*

[18]     I rejected this "average lodestar" approach when I directed the EC to prepare the Spreadsheet with the columns described in the Order.

[19]     Obvious billing mistakes were eliminated. Because various daily time records reflected excessive time spent reviewing Verilaw/LexisNexis File and Serve, each firm was allotted 325 hours (the equivalent of fifteen minutes per day for four years) for time spent reviewing postings on Verilaw/LexisNexis File and Serve. The hours were divided among the attorneys with the highest billable rates.

after reductions ("credited hours") were divided into three separate time periods: (i) "pre-organization" time represents inception through 9/10/01; (ii) "post-organization" but "pre-*Miles*" time represents 9/11/01 through 12/31/06; and (iii) "post-*Miles*" time represents 1/1/07 through fee and expense request submissions. The "average total lodestars" were calculated as follows.

Pre-Organization Time

We credited 40% of pre-organization time for firms that did not have any clients that served as either lead plaintiffs or class representatives. For those firms that had clients that served as lead plaintiffs or class representatives, we credited 100% of their pre-organization time.

Pre-*Miles* Time:

We credited 100% of all time during this period (with the aforementioned exceptions of commuting time and questionable hours).

Post-*Miles* Time:

As recognized by this Court, the risk of the case increased substantially after the Second Circuit rendered its Miles decision which had at least three tangible impacts on the litigation: (i) the $1 billion Issuer Settlement guarantee was eliminated; (ii) the $425 million JP Morgan settlement was scuttled; and (iii) the breadth of a future class being certified was compromised. As a result, we provided for a 2.5x enhancement for any time spent by any firm after 2007 commenced.[20]

*Fourth*, enhancements were applied to each firm's "average total lodestar" for assuming increased responsibility, resulting in a "revised adjusted

---

[20]     *See* Proposal at 2.

lodestar." EC firms received a 2.5x enhancement "to reflect the monetary risk, investment and substantive work performed."[21] Steering Committee members who paid their litigation fund assessment received a 1.1x enhancement. Each non-lead firm that assumed a "team leader" role "for one of the major investment bank defendants and/or performed specialized work in the bankruptcy court" received a 1.35x enhancement.

Fifth, the "revised adjusted lodestar" was used to assign "percentages to each firm based upon the proportion that" the "revised adjusted lodestar" bore to the total average lodestar of all firms. The assigned percentages were then multiplied by the $170 million aggregate fee award to calculate preliminary fee allocations. Finally, where any non-lead firm was deficient in its litigation fund assessment, its preliminary fee allocation was reduced by that amount. For firms that would have had their fee entirely eliminated by their deficiencies, the reductions were capped at one-third of their potential fee allocation.

C.     Objections to the Proposal

On November 8, 2010, two of the fifty-two non-EC firms filed objections to the Proposal, requesting that it be rejected and that they be allocated

---

[21]     *See id.* at 3.

additional fees and costs.  The remaining plaintiffs' firms have not objected.[22]

### 1.      Siemion Huckabay, P.C.

#### a.      Role in the IPO Litigation

Siemion joined the IPO litigation in March 2003, two years after the case started and one month to the day after this Court denied the defendants' motions to dismiss.  The firm represented four out of the hundreds of lead plaintiffs and class representatives (two in each of two cases).  From March through September 2003, the firm billed a total of 106 hours to the case, mostly for client communications.  In October 2003, the firm assigned a partner and an associate to work at the EC's document repository.  The Siemion partner, Andrew Morganti, played a role akin to that of a "team leader."  Specifically, he was a senior member of the team of lawyers that, at the direction of the EC, conducted document review and depositions for a group of smaller underwriter defendants and third-parties.  In June 2005, the associate left Siemion and was not replaced by the firm at the repository.  In November 2006, Morganti also left Siemion and likewise was not replaced at the repository.

---

[22]      The Proposal invited firms to comment on the proposed allocation as it related to each firm.  Sometimes, in response to comments, the EC agreed to adjust their proposed allotment out of the EC's share of fees, with no impact whatsoever on the remaining firms or the allocation methodology.  This is the approach currently taken with regard to the Shortfall.

### b.      Fee Allocation Under the Proposal

To arrive at an adjusted lodestar for purposes of apportioning fees, Siemion had not yet joined the case so it had no lodestar during the "pre-organization" period.  Siemion was credited for 100% of its "pre-*Miles*" time.  Because Siemion ceased working on the case in November 2006, it also had no lodestar during the "*post-Miles*" period.  Based on the resulting credited hours, the Proposal calculated an average total lodestar for Siemion.  Identical to other non-EC firms, Siemion then received a 1.35x enhancement of its average total lodestar for its "team leader" role.  Siemion's enhanced lodestar was assigned a percentage that was multiplied by the full fee award of $170 million to calculate its preliminary fee allocation.  Siemion was current in its litigation fund assessment, so no deductions were applied.  Next, the Court's reductions to expense reimbursements were applied proportionally: the litigation fund contributions were reduced to 91.044% of the contributions; the travel expenses were reduced by 20%; in-house copying costs by 10%; and external reproduction by 30%.

### c.      Objection to the Proposal

Siemion objects to the Proposal on the following grounds.  *First*, Siemion contends that the work performed by its former partner and former associate is undervalued by the Proposal.  Specifically, Siemion contends that

because its partner served as the team leader for a discovery team responsible for multiple underwriters, it should receive multiple team leader enhancements.[23] *Second*, Siemion argues that the Proposal should have used the rates the Court used in approving the aggregate award, rather than the average lodestar.[24]  *Third*, Siemion also argues that the Proposal improperly, and arbitrarily, awards the EC firms an across-the-board 2.5x enhancement.[25]  Finally, while conceding that the Court reduced all counsels' request for reimbursement of travel expenses by 20%, Siemion objects to that reduction being applied to its expenses.[26]  In sum, Siemion asks this Court to quadruple its fee award to $3.9 million because its allocation of $1.08 million is "far too low" based on its purported contribution to and role in the underlying litigation.[27]

---

[23]     *See* Memorandum of Law of Siemion Huckabay, P.C. in Support of Its Objection to the Proposal of Plaintiffs' Executive Committee Concerning the Allocations fo Attorneys' Fees and Expenses at 12.

[24]     *See id.* at 13.  The Court is in agreement on this point and the Spreadsheet so reflects.

[25]     *See id.* at 14-15.

[26]     *See id.* at 15-16.

[27]     *Id.* at 1.

### 2.    Johnson & Perkinson

#### a.    Role in the IPO Litigation

J&P represented one of the hundreds of lead plaintiffs in one of the 309 IPO cases.  Like the other lead plaintiffs and class representatives, J&P's client produced documents during discovery.  And J&P, like dozens of other firms, played a supporting role in the IPO cases by providing attorneys for document review at the EC's document repository.  One attorney worked at the repository from about October 2003 through September 2008, and another from about July 2004 through May 2007.  The firm also completed about sixteen research memos between June 2002 and April 2004, sometimes in a matter of days.[28]

#### b.    Fee Allocation Under the Proposal

The Proposal credited J&P for 100% of its "pre-organization" time, 100% of its "pre-*Miles*" time and applied a 2.5x enhancement for its "post-*Miles*" time (as was done for all firms' "post-*Miles*" time).  Based on the resulting credited hours, the Proposal calculated an average total lodestar for J&P.  J&P's average total lodestar was not enhanced, as it did not assume any "team leader" roles or a position on a committee.  J&P's average total lodestar was assigned a percentage

---

[28]    *See* Johnson & Perkinson's Combined Memorandum in Support of Its Objection to the Executive Committee's Fee Division and in Support of Its Motion for an Allocation of Fees from Those Awarded to Plaintiffs' Counsel at 5-6.

that was multiplied by the full fee award of $170 million to calculate its preliminary fee allocation.  J&P was current in its litigation fund assessment, so no deductions were applied.  Next, the Court's reductions to expense reimbursements were applied proportionally: the litigation fund contributions were reduced to 91.044% of the contributions; the travel expenses were reduced by 20%; in-house copying costs by 10%; and external reproduction by 30%.

### c.    Objections to the Proposal

J&P objects to the Proposal on the following grounds.  *First*, J&P argues that the Proposal impermissibly inflated the EC's fee allocation to its detriment by ignoring the Court's rulings on the cap on hourly rates and the EC's portion of the aggregate fee award.[29]  J&P complains that the EC prejudiced its fee request by failing to submit a non-EC lodestar when it petitioned eighteen months ago for the aggregate fee award.  *Second*, J&P contends that the Proposal's 2.5x enhancement as applied to the EC is unfounded and unreasonable.[30]  Further, J&P disputes uniform application of the 2.5x enhancement to all EC firms where, unlike J&P, EC firm Sirota withdrew its document review support post-*Miles I*, and Lovell withdrew the majority of its support from the document repository.  J&P

---

[29]    *See id.* at 2.

[30]    *See id.*

18

takes special exception with the Proposal's treatment of Lovell as a *de facto* Executive Committee member, alleging that Lovell's contributions as lead counsel of the antitrust case, whose dismissal was affirmed on appeal, failed to result in an actual benefit to the class.[31]  Finally, identical to Siemion, J&P contends that the EC unfairly applied the Court's 20% reduction in travel expenses reimbursement to all firms.  In sum, J&P seeks to quadruple its fee allocation from $1,623.316 to $5,690,732.[32]

## II.   LEGAL STANDARD

"It is well established that the common fund doctrine permits attorneys whose work created a common fund for the benefit of a group of plaintiffs to receive reasonable attorneys' fees from the fund."[33]  Once a class action settlement and aggregate award of attorneys' fees have been approved, district courts have discretion to appoint a committee of plaintiffs' counsel to recommend how to divide the aggregate fee to award "reasonable" attorneys'

---

[31]    *See id.* at 14-15.

[32]    *See id.* at 32.

[33]    *Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82, 86 (2d Cir. 2010) (citing *In re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113, 128-29 (2d Cir. 2010) (per curiam)); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 356 (E.D.N.Y. 2010) (same).

fees.[34]

District courts routinely give lead counsel the initial responsibility of devising a fee allocation proposal "as they deem appropriate, based on their assessments of class counsel's relative contributions."[35]  District courts similarly acknowledge that, by working together and communicating daily, often from the case's inception, class counsel is best positioned to determine the "weight and merit of each other's contributions."[36]

---

[34]    *See*, *e.g.*, *Victor*, 623 F.3d at 87, *aff'g In re Adelphia Commmc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529, 2008 WL 4128702 (S.D.N.Y. Sept. 3, 2008).

[35]    *In re Vitamins Antitrust Litig.*, 398 F. Supp. 2d 209, 224 (D.D.C. 2005) (listing cases in support).

[36]    *In re Copley Pharm., Inc.*, 50 F. Supp. 2d 1141, 1148 (D. Wyo. 1999). *Accord In re Auto. Refinishing Paint Antitrust Litig.*, MDL Docket No. 1426, 2008 WL 63269, at *7 (E.D. Pa. Jan. 3, 2008) ("Courts generally approve joint fee applications which request a single aggregate fee award with allocations to specific firms to be determined by Co-Lead Counsel, who are most familiar with the work done by each firm and each firm's overall contribution to the litigation."); *In re Ampicillin Antitrust Litig.*, 81 F.R.D. 395, 400 (D.D.C. 1978) (stating that, over a long period of litigation, "it is virtually impossible for the Court to determine as accurately as can the attorneys themselves the internal distribution of work, responsibility and risk").  Indeed, the final judgments in this case, provided to all plaintiffs' firms in advance of the settlement hearing, provided that the EC would determine the fair and reasonable allocations of the aggregate fee award, further demonstrating the expectation that substantial deference should be afforded to such proposals.

In *In re Copley Pharmaceuticals, Inc.*, the district court expressly
addressed the breadth of the court's reliance on the lead counsel's
recommendations in approving the fee allocation proposal:

> [T]he court should and must rely, to a degree, on the voice
> of Lead Counsel on the responsibilities of class counsel
> members, quality of their work, and novelty of issues
> involved. It was Lead Counsel who managed the plaintiffs'
> case. Furthermore, as previously discussed, it is well
> established that Lead Counsel must play an invaluable role
> on a variety of matters in a complex litigation case . . . .[37]

Based on lead counsel's familiarity with the underlying litigation, fee
allocation proposals are often afforded substantial deference.  "Although the
ultimate decision with respect to the award and allocation of counsel fees is
reserved for the court, we will give *substantial deference* to the recommendations
of the Committee as long as we conclude that the recommendations are fair and
reasonable."[38]  District courts should also provide a "concise but clear
explanation" for their rationale in approving, modifying, or rejecting the
recommendation.[39]

---

[37]     50 F. Supp. 2d at 1149-50.

[38]     *In re Diet Drugs Prods. Liab. Litig.*, No. Civ.A. 99-20593, MDL
1203, 2003 WL 21641958, at *6 (E.D. Pa. May 15, 2003) (emphasis added).

[39]     *In re Diet Drugs Prods. Liab. Litig.*, 401 F.3d 143, 173 (3d Cir. 2005)
(Ambro, J., concurring).  *Accord In re "Agent Orange" Prod. Liab. Litig.*, 818
F.2d 216, 222 (2d Cir. 1987); *Smiley v. Sincoff*, 958 F.2d 498, 501-02 (2d Cir.

Under *Goldberger v. Integrated Resources, Inc.*, district courts have broad discretion to determine reasonableness pursuant to the following six factors: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.[40] In addition, courts consider "qualitative comparison[s] between non-lead and lead counsels' work products [to be] certainly appropriate when determining whether non-lead counsel has provided a substantial benefit to the class" for the purpose of approving proposed fee allocations.[41]

## III.   DISCUSSION

### A.   Lead Counsel's Fee Proposal, as Adjusted in the Spreadsheet, Is Correct

Lead counsel is best positioned to gauge the relative contributions of

_____

1992).

[40]    *See Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 50 (2d Cir. 2000) (quotation marks and citation omitted).

[41]    *Victor*, 623 F.3d at 88.  *Accord Class Plaintiffs v. Jaffe & Schlesinger, P.A.,* 19 F.3d 1306, 1308 (9th Cir. 1994) ("It is well established that an award of attorneys' fees from a common fund depends on whether the attorneys' specific services benefited the fund - whether they tended to create, increase, protect or preserve the fund.") (quotation marks and citation omitted); *Turner v. Murphy Oil USA, Inc.,* 582 F. Supp. 2d 797, 809 (E.D. La. 2008) (considering, when allocating aggregate fee awards, other factors such as financial resources, number of cases and relative contribution of legal work in terms of time and type).

each firm because, by assuming nearly every task litigation could require (from arguing appeals to answering phones), the EC is intimately aware of the distribution of responsibility and work that ultimately led to final approval of the settlement.  As supervisors in daily contact with non-EC firms for over four years of discovery, the repository supervisors have firsthand knowledge of the EC's delegated tasks and the work produced by the non-EC firms.  All of plaintiffs' briefs were drafted and ultimately submitted by the EC.  Finally, it is the EC firms who have not only contributed over $10.5 million to the plaintiffs' litigation fund, but jointly and severally exposed themselves to liability by guaranteeing a $20 million expert fee.

Contrary to the Objectors' contentions, fee disputes do not limit a district court's ability to substantially defer to lead counsel's fee allocation proposal, so long as the district court reasonably analyzed the reasonableness of the proposed fee distribution.[42]   This Court has directed that "[t]he award of attorneys' fees shall be allocated among Plaintiffs' Counsel by, and in a fashion which in the opinion of, Plaintiffs' Executive Committee, fairly compensates Plaintiffs' Counsel for their respective contributions in the prosecution of this Action."[43]   That is

---

[42]      *Victor*, 623 F.3d at 87.

[43]      *See, e.g.*, 11/24/09 Order and Final Judgment, *In re 724 Solutions, Inc. IPO Sec. Litig.*, No. 01 Civ. 5333, ECF Document No. 24.

exactly what the Proposal does.  It fairly allocates reasonable fees and expenses to each plaintiffs' firm in accordance with the six factors set forth in *Goldberger*.[44]

*First*, the EC expended substantial time and labor over almost ten years.  The EC's efforts totaled over 677,000 hours compared to 350,000 hours for the non-EC firms.  The character of the total hours is informed by reviewing the other *Goldberger* factors.  The second consideration is the magnitude and complexity of the litigation, which was managed exclusively by the EC.  These seven Lead Counsel firms organized and oversaw the entire IPO Litigation, a role which included responsibility for each significant decision, drafting the pleadings and nearly every brief, delegating supporting tasks to non-lead firms, overseeing the discovery process, and persisting in protracted negotiations to reach a settlement.[45]

*Third*, the EC firms bore, and continue to bear, almost all the risk of this litigation.  Their expenses total nearly $43 million, whereas the non-EC firms only contributed $7.5 million.  The risk was especially pronounced in the wake of *Miles I*, as recognized by this Court:

---

[44]    *See Goldberger*, 209 F.3d at 50.

[45]    *See In re Vitamins Antitrust Litig.*, 398 F. Supp. 2d at 226-27 (identifying roles each firm played in contributing to the litigation to ensure reasonable fee allocations).

The findings in *Miles I* dramatically increased the risks of continuing this litigation by severely restricting the class size and reducing the estimated aggregate damages.

Counsel could have thrown up their hands at this juncture, reasoning that further efforts would likely fail to lead to any concrete results. Instead, they petitioned the Court of Appeals for a rehearing (resulting in *Miles II*) and filed amended complaints in each of the six focus cases and an amended set of "Master Allegations" that re-defined the class pursuant to the Second Circuit's rulings. They also submitted extensive briefing opposing defendants' motions to dismiss. After this Court largely denied defendants' motions, counsel then moved for class certification again. In response, counsel notes, defendants "unleashed an army of countervailing expert reports." Plaintiffs' counsel then engaged in protracted settlement negotiations with defendants that lasted nine months. *There was a serious risk that work performed even in the last three years would fail to yield any results.*[46]

*Fourth*, as to the quality of representation, although each non-EC firm contributed in some manner, the parties would not have reached a final settlement without the lawyering of Lead Counsel. The same cannot be said for any of the non-EC firms. After an initial setback in the Court of Appeals, it was the EC who pushed ahead with a renewed effort, formulating a more modest class that this Court approved. *Fifth*, most of the Proposal's fee allocation methodology is reasonable for many of the aforementioned *Goldberger* factors: EC's time and labor, the magnitude and complexity of the case, the risk borne in this litigation,

---

[46]     *In re IPO*, 671 F. Supp. 2d at 509-10 (emphasis added).

and the quality of representation.  Given the disproportionately large role played by the EC over the course of this lawsuit, an award of the majority of attorneys' fees is reasonable.

Lastly, there are considerations of public policy.  Rewarding Lead Counsel for their greater contributions and risk is consistent with the public policy favoring class action litigation.  In this case, it is the EC that made the most significant contributions and assumed a majority of the risk.  Indeed, all six *Goldberger* factors point to the reasonableness of the allocation of attorneys' fees as set forth in the Spreadsheet.

### B.    The Objectors Are Not Entitled to Additional Fees or Expenses

The fees as allocated in the Spreadsheet fairly allocates reasonable awards to each firm.  To achieve equitable fee apportionments, the EC expended great effort, time, and resources (including an overhaul of the allocation methodology in response to a first round of comments).

In determining reasonableness of attorneys' fees, different methodologies are used to determine a fair aggregate award versus a fair allocation of that aggregate award.  Determination of a reasonable and fair aggregate award requires a measured analysis of the appropriate fees that the Court believes class counsel may charge the class (its client) for its work in the litigation.  By contrast,

determination of a reasonable and fair allocation of the aggregate award requires a focus on the relative contributions of each firm.  Simply put, the calculation shifts from measuring the *overall* sum of the aggregate fee award to measuring the *relative* sums of the fee allocations.  Accordingly, the allocation in the Spreadsheet adequately contemplates the relative contributions of Lead Counsel and non-EC counsel and, in doing so, awards reasonable fees to each of the plaintiffs' firms.

Moreover, although the Objectors contend that they have been "undercompensated" by comparison to the EC, every firm received a negative multiplier (a multiplier less than one) on its fee award.  In other words, not one of the plaintiffs' firms received their requested lodestar.  Instead, every firm was awarded a fraction of its requested fees and was thus compensated for a small fraction of the time spent on the case.[47]   Accordingly, the Spreadsheet carefully considers each firm's contributions that conferred a benefit on the class and, in doing so, the Spreadsheet allocates reasonable fees to all firms.

### C.    The Proposal Properly Applied Enhancements for Increased Responsibilities

In allocating fees, the Proposal applied enhancements for the following increased responsibilities: (1) "team leader" roles; (2) EC membership;

---

[47]      *See id.* at 515-16 (finding the aggregate fee award to be reasonable where it represented a negative multiplier to the total adjusted lodestar calculated by this Court, thereby presenting "no real danger of overcompensation").

(3) Steering Committee membership; and (4) bankruptcy team membership.[48]

Specifically, the Proposal enhanced fee allocations for those non-EC firms that

assumed "team leader" roles.  As a non-EC firm occupying a "team leader" role,

Siemion was awarded a 1.35x enhancement.  J&P did not receive this

enhancement.

### 1.    Each Firm Assuming a "Team Leader" Role Was Awarded a 1.35x Enhancement

Siemion seeks a 1.35x enhancement for each of the eight banks for

which it alleges to have acted as a "team leader."  By requesting multiple

enhancements, Siemion entirely misreads the Proposal to state that enhancements

are to be awarded for "*every* investment bank" for which a non-lead firm acted as

"team leader."  The Proposal plainly states: "We also provided a 1.35x

enhancement to non-EC firms that had team leaders for one of the major

investment bank defendants and/or performed specialized work in the bankruptcy

court."[49]   The Proposal clearly provides only one enhancement for a firm's "team

leader" role to reflect the nature of the increased responsibility; it does not envision

multiple enhancements for team leaders of  more than one major investment bank

defendant.

---

[48]     *See* Proposal at 3.

[49]     *Id.*

Siemion is in no way treated unfairly or disproportionately as *no* firm received multiple enhancements for team leadership as to multiple investment bank defendants.  To be clear, all non-EC firms that assumed "team leader" roles were compensated with the same multiplier, 1.35x, as was Siemion for its "team leader" role.  Therefore, Siemion's claim that the EC acted in bad faith by applying an improperly low enhancement is without merit.

### 2.    Each EC Firm Was Awarded a 2.5x Enhancement

District courts routinely approve proposed fee allocations that include enhancements to lead counsel's award. [50]  And class counsel appointed to fee allocation committees are entitled to compensation for the additional work provided on behalf of the class.[51]

---

[50]     *See*, *e.g.*, *In re Adelphia*, 2008 WL 4128702, at *1 n.2 (noting that courts have awarded lead plaintiffs' counsel enhancements over non-lead plaintiffs' firms to compensate for the increased contribution made, risk assumed, and benefit provided to the litigation); *Silverberg v. People's Bank*, 23 Fed. App'x 46, 48 (2d Cir. 2001) (unpublished), *aff'g* 2000 WL 502621 (D. Conn. Mar. 17, 2000); *In re Vitamins Antitrust Litig.,* 398 F. Supp. 2d at 209.  *See also In re FPI/Agretech Sec. Litig.*, 105 F.3d at 476 (affirming district court's authority to determine that the contribution alleged by one of the plaintiffs' firms did not merit any compensation).

[51]     *See*, *e.g.*, *In re Terra-Drill Partnerships Sec. Litig.*, 733 F. Supp. 1127, 1132 (S.D. Tex. 1990) (applying a 2.5x enhancement for lead counsel and no enhancement for the other two firms representing plaintiffs); *Silverberg*, 23 Fed. App'x at 48 (applying a 2.56x enhancement to lead counsel's award for its brilliance at trial, even though the lead counsel had acted as local counsel until five months prior to trial; no enhancement was applied to the other firm due to its

In deciding whether to approve an enhancement on individual fee allocations, district courts have placed greater weight on whether the firm's contributions achieved a benefit for class.[52]  Here, the Proposal applied a 2.5x enhancement to EC members, a 1.1x enhancement to Steering Committee members, and a 1.35x enhancement to non-lead firms who assumed a "team leader" role for one or more of the major investment bank defendants and/or assisted with the bankruptcy litigation.  The EC's 2.5x enhancement is well within the range of enhancements repeatedly approved by district courts.[53]

As for the 2.5x enhancement to Lovell's allocated fees, unlike other non-EC firms, Lovell assumed a level of risk in terms of personnel and financial commitment borne by the EC firms (by co-guaranteeing the $20 million expert's fee and contributing over $1.5 million dollars to the plaintiffs' litigation fund) and

---

minimal contribution.); *In re Interpublic Secs. Litig.*, Nos. 02 Civ. 6527, 03 Civ. 1194, 2004 WL 2397190, at *12 (S.D.N.Y. Oct. 26, 2004) (approving a 3.96x enhancement for lead counsel who took on considerable risk and denying the three derivative action firms' requested 1.07x enhancement because they conferred no benefit to the class other than dropping a derivative action).

[52]     *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 590 (S.D.N.Y. 2008).

[53]     *See  Forbush v. J.C. Penney Co.*, 98 F.3d 817, 821-22 (5th Cir. 1996) (affirming fee allocations, where the common fund had not yet been determined, that enhanced lead counsel's award between 4.6x to 8.2x, and applying a 2.0x enhancement to compensate local counsel's efforts).

substantively contributed in a manner unparalleled by non-lead firms in this action.
In assuming such risks, Lovell was the only firm whose contributions were on par
with the EC firms.

Furthermore, Siemion's claim – that fee allocations proposed by
appointed committees are not entitled to substantial deference due to conflicts of
interest –  makes no sense.  Taking Siemion's misguided rationale to its logical
conclusion, all class counsel appointed to submit fee allocation proposals would
have conflicts and thus no deference would ever be afforded to a committee's
proposal.  Siemion's argument obviates the entire purpose of court-appointed lead
counsel (who have been repeatedly recognized as best suited to gauge the value of
one another's contribution to the class) to allocate fees from an aggregate award.
Moreover, the inherent threat of conflicts of interest by involving class counsel in
proposing fee allocations is precisely why district courts must ensure the fee
allocations awarded are reasonable.

### 3.   The Proposal Properly Applied the Court's 20% Reduction to Each Firm's Travel Expense Reimbursement

In its opinion awarding expense reimbursements, this Court applied a
20% reduction to *all* travel expenses because the EC's travel-related per diem cap
covered only food and lodging; it did not cover airfare or other travel related

expenses. [54]  This Court held that "[a] cap that includes only lodging and meals has little significance if no limit exists for airfare and other travel costs. I am therefore reducing travel costs by twenty percent."[55]   The Court necessarily held that the uniform reduction in travel expense was fair and reasonable when it issued its decision in October 2009.  The Proposal reduces all travel expenses by 20%, just as this Court did.

Both Siemion and J&P complain that the 20% reduction should not be applied to their expenses because they did not fly first or business class, and because they had no New York offices.  Although the EC firms also incurred large travel expenses (domestically and internationally), Siemion and J&P's argument misconstrues the Court's reasoning.  The Court held that the cap, in and of itself, was not an effective way to limit travel-related costs.  Consequently, an across the board cut was reasonable.  It is simply too late for Siemion and J&P to complain about the Court's travel expense reduction decided over one year ago.

## IV.   CONCLUSION

For the foregoing reasons, total fees shall be allocated according to the methodology described herein and in the amounts included in the attached

---

[54]     *See In re IPO*, 671 F. Supp. 2d at 505.

[55]     *Id.*

Spreadsheet.[56] Expenses and interest shall be allocated according to Exhibit A of

the Proposal. The Objectors are directed to file their Objections and any responses

thereto. The Clerk of the Court is then directed to close these motions.


SO ORDERED:

Shira A. Scheindlin
U.S.D.J.


Dated:      New York, New York
            July 8, 2011

---

[56]      I reiterate that the EC can allocate its total fee award (column G less
the Shortfall) among the EC firms as it sees fit.

**Exhibit A**

June 15, 2011 Order

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | Firm | Original Lodestar | Revised Lodestar | Revised Adjusted Lodestar w/o EC Enhancement | Revised Adjusted Lodestar w/ EC Enhancement | Fee Allocation (Revised Adjusted Lodestar w/o EC Enhancement) | Fee Allocation (Revised Adjusted Lodestar w/ EC Enhancement) | Current Proposed Allocation |
| 2 | Seeger | $13,355,441.25 | $9,603,767.50 | $18,599,671.78 | $18,599,671.78 | $9,825,954.46 | $5,078,413.50 | $4,522,780.98 |
| 3 | Glancy | $9,751,116.25 | $7,309,475.00 | $10,461,200.00 | $10,461,200.00 | $5,526,510.15 | $2,856,303.06 | $2,492,799.62 |
| 4 | Cauley | $12,807,273.25 | $8,578,786.25 | $7,811,308.04 | $7,811,308.04 | $4,126,608.15 | $2,132,782.38 | $2,026,330.48 |
| 5 | Spector | $7,992,813.75 | $6,355,020.00 | $8,249,966.13 | $8,249,966.13 | $4,358,345.27 | $2,252,552.62 | $2,310,000.00 |
| 6 | Ainsley | $6,683,105.00 | $5,730,456.50 | $7,429,235.79 | $7,429,235.79 | $3,923,981.44 | $2,028,047.05 | $1,823,416.03 |
| 7 | Bashian | $4,055,030.00 | $3,798,630.00 | $6,795,049.50 | $6,795,049.50 | $3,589,732.54 | $1,855,305.38 | $1,433,103.28 |
| 8 | Hoffman | $6,908,040.00 | $4,684,950.00 | $5,651,270.00 | $5,651,270.00 | $2,985,489.33 | $1,543,010.34 | $1,428,677.57 |
| 9 | Brualdi | $4,927,565.00 | $3,379,895.00 | $4,691,185.00 | $4,691,185.00 | $2,478,289.44 | $1,280,870.84 | $1,250,000.00 |
| 10 | Scmion | $5,413,875.50 | $5,501,475.00 | $5,290,522.75 | $5,290,522.75 | $2,794,951.08 | $1,445,160.83 | $1,080,515.95 |
| 11 | Lockridge | $3,039,981.25 | $3,039,981.25 | $4,243,945.00 | $4,243,945.00 | $2,242,018.61 | $1,158,757.42 | $866,727.80 |
| 12 | Bull | $4,117,311.25 | $3,059,250.00 | $2,911,155.00 | $2,911,155.00 | $1,537,923.72 | $794,855.36 | $675,600.00 |
| 13 | Abraham | $3,738,692.50 | $3,155,220.00 | $3,155,220.00 | $3,155,220.00 | $1,666,859.95 | $861,494.33 | $940,000.00 |
| 14 | Harwood | $4,990,032.50 | $3,457,192.50 | $3,570,615.00 | $3,570,615.00 | $1,886,307.50 | $974,912.87 | $830,816.06 |
| 15 | Goldman | $3,157,007.50 | $2,224,810.00 | $3,272,325.00 | $3,272,325.00 | $1,728,724.94 | $893,468.43 | $807,942.49 |
| 16 | Dennin | $3,064,858.50 | $2,351,657.50 | $3,160,018.00 | $3,160,018.00 | $1,669,394.67 | $862,804.37 | $843,000.00 |
| 17 | Barry | $3,601,859.75 | $2,268,413.00 | $2,504,030.00 | $2,504,030.00 | $1,322,845.10 | $683,694.85 | $662,765.74 |
| 18 | Piven | $2,721,556.75 | $2,165,895.00 | $2,326,650.00 | $2,326,650.00 | $1,229,137.65 | $635,263.40 | $650,000.00 |
| 19 | Neuwelt | $1,842,580.00 | $1,658,500.00 | $1,756,030.00 | $1,756,030.00 | $927,686.84 | $479,462.57 | $552,500.00 |
| 20 | Carney | $1,300,600.00 | $827,810.00 | $2,069,525.00 | $2,069,525.00 | $1,093,302.00 | $565,058.56 | $543,348.27 |
| 21 | Faruqi | $2,239,415.00 | $2,046,385.00 | $2,019,235.00 | $2,019,235.00 | $1,066,734.48 | $551,327.49 | $432,662.89 |
| 22 | Stamell | $1,562,642.50 | $1,271,500.00 | $1,890,715.50 | $1,890,715.50 | $998,839.37 | $516,236.80 | $663,500.00 |
| 23 | Gross | $2,159,245.00 | $1,644,850.00 | $1,645,405.00 | $1,645,405.00 | $869,245.16 | $449,257.76 | $400,000.00 |
| 24 | Weinstein | $1,830,043.00 | $1,318,363.00 | $1,257,493.00 | $1,257,493.00 | $664,316.51 | $343,343.12 | $350,000.00 |
| 25 | Holzer | $1,621,988.75 | $1,544,031.25 | $1,229,312.50 | $1,229,312.50 | $649,429.13 | $335,648.78 | $335,000.00 |
| 26 | Labaton | $2,218,330.50 | $1,859,817.50 | $880,882.75 | $880,882.75 | $465,358.42 | $240,514.29 | $300,000.00 |
| 27 | Mager | $1,473,090.00 | $810,478.75 | $686,750.75 | $686,750.75 | $362,801.11 | $187,508.92 | $250,000.00 |
| 28 | Yates | $918,622.95 | $901,625.45 | $852,879.30 | $852,879.30 | $450,564.57 | $232,868.29 | $160,760.80 |
| 29 | Schoengold | $953,854.75 | $739,565.00 | $734,225.00 | $734,225.00 | $387,881.11 | $200,471.18 | $156,498.38 |
| 30 | Frydman | $639,897.50 | $458,497.50 | $450,504.00 | $450,504.00 | $237,995.16 | $123,004.62 | $147,264.62 |
| 31 | Smith | $756,050.00 | $709,407.50 | $697,407.50 | $697,407.50 | $368,430.93 | $190,418.61 | $146,456.99 |
| 32 | Weiss | $959,693.75 | $456,950.00 | $458,375.00 | $458,375.00 | $242,153.30 | $125,153.70 | $144,901.17 |
| 33 | Emerson | $1,103,030.00 | $889,000.00 | $799,157.50 | $799,157.50 | $422,184.07 | $218,200.21 | $122,237.31 |
| 34 | Murphy | $850,850.00 | $773,500.00 | $730,315.00 | $730,315.00 | $385,815.51 | $199,403.60 | $104,404.99 |
| 35 | Finkelstein | $900,088.00 | $568,975.00 | $569,286.25 | $569,286.25 | $300,746.21 | $155,436.67 | $180,000.00 |
| 36 | Henzel | $619,399.50 | $614,596.00 | $614,596.00 | $614,596.00 | $324,682.74 | $167,807.94 | $101,007.55 |
| 37 | Izard | $591,287.50 | $482,000.00 | $517,057.50 | $517,057.50 | $273,154.47 | $141,176.24 | $92,306.66 |
| 38 | Wolf Popper | $599,788.50 | $400,762.50 | $402,802.50 | $402,802.50 | $212,795.10 | $109,980.31 | $79,016.34 |

June 15, 2011 Order

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | Firm | Original Lodestar | Revised Lodestar | Revised Adjusted Lodestar w/o EC Enhancement | Revised Adjusted Lodestar w/ EC Enhancement | Fee Allocation (Revised Adjusted Lodestar w/o EC Enhancement) | Fee Allocation (Revised Adjusted Lodestar w/ EC Enhancement) | Current Proposed Allocation |
| 39 | Perrone | $164,150.00 | $152,945.00 | $153,185.00 | $153,185.00 | $80,925.56 | $41,825.30 | $21,619.12 |
| 40 | Murray | $248,500.50 | $158,162.50 | $118,538.50 | $118,538.50 | $62,622.28 | $32,365.49 | $20,775.17 |
| 41 | Scott | $164,038.00 | $109,675.00 | $97,418.50 | $97,418.50 | $51,464.87 | $26,598.93 | $16,643.39 |
| 42 | Felgoise | $103,362.50 | $99,162.50 | $99,162.50 | $99,162.50 | $52,386.20 | $27,075.11 | $13,787.02 |
| 43 | Kantrowitz | $92,652.50 | $68,370.00 | $71,295.00 | $71,295.00 | $37,664.18 | $19,466.23 | $11,421.39 |
| 44 | Urbach | $128,175.00 | $124,375.00 | $68,557.00 | $68,557.00 | $36,217.73 | $18,718.65 | $9,515.21 |
| 45 | Krinsk | $47,051.25 | $41,105.00 | $41,920.63 | $41,920.63 | $22,146.10 | $11,445.92 | $9,262.97 |
| 46 | Kirby | $212,783.75 | $133,425.00 | $50,240.00 | $50,240.00 | $26,541.11 | $13,717.42 | $25,000.00 |
| 47 | Trinko | $88,811.00 | $62,600.00 | $41,663.00 | $41,663.00 | $22,010.00 | $11,375.57 | $6,919.17 |
| 48 | Federman | $79,869.50 | $42,160.00 | $33,934.00 | $33,934.00 | $17,926.87 | $9,265.26 | $6,815.36 |
| 49 | Morris | $63,880.00 | $53,200.00 | $45,130.00 | $45,130.00 | $23,841.57 | $12,322.20 | $6,763.62 |
| 50 | Obstfeld | $60,062.50 | $48,050.00 | $40,430.00 | $40,430.00 | $21,358.62 | $11,038.92 | $6,192.67 |
| 51 | Klein | $68,120.00 | $43,080.00 | $30,201.00 | $30,201.00 | $15,954.78 | $8,246.01 | $5,252.19 |
| 52 | Susser | $14,700.00 | $14,000.00 | $17,375.00 | $17,375.00 | $9,178.98 | $4,744.03 | $2,424.77 |
| 53 | Reuben | $33,496.00 | $33,496.00 | $13,398.40 | $13,398.40 | $7,078.19 | $3,658.27 | $1,824.21 |
| 54 | Bernstein | $68,765,866.25 | $37,365,168.75 | $52,304,496.88 | $130,761,242.19 | $27,631,756.65 | $35,702,762.17 | $37,857,912.78 |
| 55 | Milberg | $70,403,530.85 | $39,257,441.50 | $50,811,200.13 | $127,028,000.31 | $26,842,868.22 | $34,683,446.02 | $37,857,912.78 |
| 56 | Kessler Topaz | $27,589,883.80 | $14,846,421.00 | $16,833,756.13 | $42,084,390.31 | $8,893,045.16 | $11,490,629.44 | $12,227,488.88 |
| 57 | Sirota | $23,461,082.50 | $15,795,848.75 | $19,554,422.15 | $48,886,055.37 | $10,330,336.14 | $13,347,741.12 | $12,067,377.96 |
| 58 | Brody | $22,850,372.45 | $9,443,362.00 | $12,041,229.63 | $30,103,074.06 | $6,361,218.38 | $8,219,277.18 | $7,711,797.05 |
| 59 | Lovell | $37,833,377.95 | $26,546,989.00 | $29,635,280.88 | $74,088,202.19 | $15,655,917.15 | $20,228,879.89 | $19,038,113.37 |
| 60 | Wolf Haldenstein | $27,006,487.50 | $17,624,532.50 | $19,472,690.00 | $48,681,725.00 | $10,287,158.15 | $13,291,951.20 | $13,453,888.96 |
| 61 | | | | | | | | |
| 62 | Totals | $403,295,311.00 | $257,120,939.45 | $321,955,923.66 | $622,935,537.33 | $170,084,950.00 | $170,084,950.00 | $170,084,950.00 |
| 63 | | | | | | | | |
| 64 | | | | | | | | |
| 65 | | | | | | | | |
| 66 | | | | | | | | |
| 67 | Non-EC Amount | | | | | $64,082,650.14 | $33,120,262.98 | $29,870,458.22 |
| 68 | EC Amount | | | | | $106,002,299.86 | $136,964,687.02 | $140,214,491.78 |
| 69 | Total | | | | | $170,084,950.00 | $170,084,950.00 | $170,084,950.00 |
| 70 | | | | | | | | |

## - Appearances -

## For Plaintiffs' Executive Committee:

Stanley D. Bernstein, Esq.
Rebecca M. Katz, Esq.
Christian Siebott, Esq.
Bernstein Liebhard LLP
10 East 40th Street
New York, New York 10016
(212) 779-1414

Robert A. Wallner, Esq.
Ariana J. Tadler, Esq.
Peter G.A. Safirstein, Esq.
Neil Fraser, Esq.
Milberg LLP
One Pennsylvania Plaza
New York, New York 10119
(212) 946-9453

David Kessler, Esq.
Barroway Topaz Kessler Meltzer &
Check LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

Jules Brody, Esq.
Stull, Stull & Brody LLP
6 East 45th Street
New York, New York 10017
(212) 687-7230

Howard B. Sirota, Esq.
Sirota & Sirota LLP
260 Madison Avenue
New York, New York 10016
(212) 425-9055

Fred Taylor Isquith, Esq.
Thomas H. Burt, Esq.
Wolf Haldenstein Adler Freeman & Herz
270 Madison Avenue
New York, New York 10016
(212) 545-4600

**Liaison Counsel for Underwriter Defendants:**

Gandolfo V. DiBlasi, Esq.
Penny Shane, Esq.
David M.J. Rein, Esq.
Richard J.L. Lamuscio, Esq.
Sullivan and Cromwell LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

**Liaison Counsel for Issuer Defendants:**

Jack C. Auspitz, Esq.
Joel C. Haims, Esq.
Hilary M. Williams, Esq.
Angela T. Rella, Esq.
Reema S. Abdelhamid, Esq.
Morrison and Foerster LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 468-8000

**Counsel for Siemion Huckabay Objector:**

David B. Gordon, Esq.
Richardson & Patel, LLP
750 Third Avenue, 9th Floor
New York, New York 10017
(646) 755-7315

**Counsel for Johnson & Perkinson Objector:**

Jacob B. Perkinson, Esq.
Dennis J. Johnson, Esq.
Johnson & Perkinson
1690 Williston Road
South Burlington, Vermont 05403
(802) 862-0030